[This decision has been published in *Ohio Official Reports* at 90 Ohio St.3d 460.]

THE STATE OF OHIO, APPELLEE, *v*. TREESH, APPELLANT.

[Cite as *State v. Treesh*, 2001-Ohio-4.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-2542—Submitted July 6, 2000—Decided January 3, 2001.)

APPEAL from the Court of Appeals for Lake County, No. 95-L-057.

―――――――――――

COOK, J.

{¶ 1} Appellant, Frederick Treesh, and two companions, Keisha Harth and Benjamin Brooks, departed Cleveland on August 27, 1994, to smoke crack cocaine in an Ashtabula hotel room. They returned to Cleveland later that day to purchase additional drugs. While there, the group picked up another man, Anthony Washington, who agreed to assist them. After a "couple hours" of driving and smoking cocaine, the group decided to rob a business to finance the purchase of more cocaine.

{¶ 2} Washington eventually directed the group to the Vine Street News, an adult bookstore in Eastlake, Lake County. Treesh and Brooks were armed with a nine-millimeter handgun and a sawed-off shotgun. The handgun was loaded to maximum capacity with "Hydra-Shok" bullets, designed for penetration and maximum stopping power. Before Treesh and Brooks entered the bookstore, Harth handed Treesh a roll of duct tape that Treesh planned to use to restrain the robbery victims.

{¶ 3} Treesh and Brooks entered the Vine Street News at approximately 11:30 p.m. After glancing at a few magazines, Treesh and Brooks approached the sales counter where Louis Lauver worked. Treesh pulled out the nine-millimeter handgun, cocked it, pointed it at Lauver, and ordered him not to move or call out for help. Treesh then asked Lauver where the security guard was, and Lauver

motioned toward the rear of the store. Treesh walked through swinging doors into the restricted area at the rear of the store and placed the handgun inside his pants. At this point, Lauver lost sight of Treesh. A short time later, however, Lauver heard four gunshots coming from the rear of the store.

{¶ 4} Treesh testified that after passing through the swinging doors into the rear portion of the store, he saw two customers behind a rack, looking at magazines, and saw the store security guard, Henry Dupree, sitting in a chair, watching television. At first, neither Dupree nor the customers appeared to notice Treesh's presence. Treesh took the gun out of his pants, poked Dupree in the shoulder with the gun, and ordered Dupree to stand up. Startled, Dupree complied. Treesh testified that he originally intended to take Dupree to the front of the store and tape him up with the clerk, but then noticed handcuffs on Dupree's pants and decided to use them. According to Treesh, a struggle ensued when he reached for Dupree's handcuffs, and the handgun discharged.

{¶ 5} While Treesh was in the rear of the store, Brooks ordered Lauver to empty the cash register. Lauver complied, and Brooks demanded that Lauver open the safe. As Lauver explained that this was impossible, shots rang out from the back of the store and Treesh came rapidly back through the swinging doors. Brooks quickly left with the money from the cash register. Lauver stood by the counter with his hands in the air as Treesh headed toward the exit. Before reaching the door, Treesh brought the handgun up, pointed it at Lauver, and fired at least two shots. Bullets struck Lauver in the jaw and forearm. Treesh later testified that he aimed these shots not at Lauver, but at the telephone on the wall behind the counter.

{¶ 6} After Treesh left the store, Lauver temporarily lost consciousness, but awoke shortly thereafter and dialed 911. Dupree, grievously injured during his encounter with Treesh at the rear of the store, managed to make his way through the swinging doors, but collapsed on the floor behind the counter. An autopsy later

confirmed that Dupree died as a result of two close-range gunshot wounds in his chest. Lauver survived and testified at trial.

{¶ 7} Paul Forner, a witness across the street at a drive-up pay telephone, saw two men enter the Vine Street News. Minutes later, Forner heard popping sounds and saw the two men leave. Forner rushed to the store and found Lauver on the phone with the police. Because Lauver was wounded in the face and had difficulty speaking, Forner gave the dispatcher a description of the suspects and their vehicle. Dale Plunkard, a store customer who hid in a viewing booth during Treesh's encounter with Dupree, heard three or four shots in steady succession, "one right after another," and then emerged from the booth to find Dupree unconscious. Like Forner, Plunkard was able to identify the suspects' vehicle, which he had seen parked nearby before he entered the store.

{¶ 8} Sergeant Ronald Stih of the Euclid Police Department received a dispatch concerning the armed robbery. Stih scanned traffic on Interstate 90, spotted a vehicle matching the dispatcher's description, and followed it off the interstate. Officer Frederick Stoldt of the Euclid Police Department also pursued the suspects' car. The vehicles attained speeds of over sixty miles an hour in a residential neighborhood. As Washington drove the suspects' car, Treesh shot out its rear window, and both Brooks and Treesh fired shots through the opening and over the tops of the cruisers to discourage pursuit. Eventually, however, Washington lost control of the car and crashed.

{¶ 9} According to Sergeant Stih, Treesh assumed an "action stance" as he got out of the car and pointed his handgun at Stih. Treesh fired the weapon at Stih and Stoldt at least three times. Stih retreated and radioed for help. Treesh fired additional shots while running away with Harth. Brooks remained in the car and was immediately apprehended.

{¶ 10} Officers Michael Janusczak and Harold Pretel of the Cleveland Police Department arrived at the scene, obtained descriptions of Treesh and Harth,

and pursued the two suspects on foot. Eventually, the officers approached a garage, where Pretel saw Treesh aiming a gun at him. Pretel ordered Treesh to drop the weapon. Treesh threw the gun down, but attempted to flee over a fence. Several officers confronted Treesh as he jumped over the fence and ordered him to the ground. Officer Janusczak testified that as he handcuffed Treesh, he immediately advised Treesh of his *Miranda* rights.

{¶ 11} The police transported Treesh first to Euclid, then to the Eastlake Police Department. On the way to Eastlake, Treesh heard on the police radio that Dupree had died. Treesh later testified that he was not aware prior to that time that he had even shot Dupree.

{¶ 12} Treesh arrived at Eastlake just after 2:00 a.m. on August 28. Treesh testified that he felt "high" and "paranoid" at that time. Lieutenant Thomas Doyle of the Eastlake Police Department and Federal Bureau of Investigation Special Agent Robert Alvord conducted a series of interviews with Treesh and Brooks at Eastlake. Some of these interviews were captured on the stationhouse videotape recorder. Portions of these videotapes, which contained several inculpatory statements, were later played for the jury. At approximately 2 p.m. on August 28, Doyle confronted Treesh and Brooks with the store clerk's statement, and the suspects refused to discuss their participation in the Vine Street News robbery any further without an attorney present. Treesh and Brooks continued to discuss their involvement in other crimes.

{¶ 13} The Lake County Grand Jury returned a seven-count indictment against Treesh on August 29. A Lake County jury found Treesh guilty of one count of aggravated murder with two aggravating circumstances, two counts of attempted aggravated murder, one count of felonious assault, and one count of aggravated robbery. Each of these five counts included a firearm specification. The court entered a *nolle prosequi* on count six, which had alleged that Treesh failed to

4

comply with the order or signal of a police officer. Treesh pleaded guilty to count seven, carrying a weapon while under a disability.

{¶ 14} At the conclusion of the penalty phase, the jury recommended that the court sentence Treesh to death. The trial court adopted the jury's recommendation and sentenced Treesh accordingly. Treesh timely appealed the decision of the trial court to the Lake County Court of Appeals, which affirmed his convictions and death sentence. In dissent, Judge O'Neill concluded that Treesh had never received proper *Miranda* warnings, and that absent the inferences drawn from Treesh's improperly obtained statements, the state could not prove the lack of mitigating factors beyond a reasonable doubt.

{¶ 15} The cause is now before this court upon an appeal as of right.

{¶ 16} Appellant presents twenty-one propositions of law for our consideration. For the reasons set forth below, we affirm the judgment of the court of appeals and uphold the sentence of death.

I. Summarily Rejected Propositions of Law

{¶ 17} R.C. 2929.05 does not require this court to address and discuss in opinion form each proposition of law raised in a capital case. *State v. Davis* (1996), 76 Ohio St.3d 107, 110, 666 N.E.2d 1099, 1104. Accordingly, we summarily overrule those propositions of law that have been previously resolved by this court and address only those issues that warrant discussion.[1] *Id.*

---

1. We summarily reject appellant's sixth proposition of law (number of peremptory challenges) on the authority of *State v. Mills* (1992), 62 Ohio St.3d 357, 365, 582 N.E.2d 972, 981; see, also, *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382, paragraph two of the syllabus. We reject appellant's eighteenth proposition of law (exclusion of testimony regarding firearm specifications' effect on total sentence) on the authority of *State v. White* (1999), 85 Ohio St.3d 433, 448, 709 N.E.2d 140, 155-156. We overrule appellant's twentieth proposition of law (constitutionality of Ohio's capital sentencing scheme) on the authority of *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph one of the syllabus; see, also, *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668. We reject appellant's twenty-first proposition of law (specification to Count One/double jeopardy) on the authority of *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 198, 616 N.E.2d 909, 920.

II. Guilt-Phase Issues

A. Pretrial Publicity/Venue

{¶ 18} In his first proposition of law, Treesh contends that he was entitled to a change of venue because "the incident in question [was] highly publicized locally and nationally." Treesh relies on Crim.R. 18(B), which provides that "[u]pon the motion of any party or upon its own motion the court may transfer an action * * * when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." Although Treesh claims to have filed a motion for change of venue, we are unable to locate any such motion in the record. Nevertheless, because the trial docket contains an entry denying a motion for change of venue, we shall address this proposition on its merits.

{¶ 19} As this court has noted, Crim.R. 18(B) does not require a change of venue merely because of extensive pretrial publicity. *State v. Landrum* (1990), 53 Ohio St.3d 107, 116-117, 559 N.E.2d 710, 722-723. Any decision on a change of venue rests in the sound discretion of the trial court. *Id.* at 116, 559 N.E.2d at 722. " '[A] careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " *Id.* at 117, 559 N.E.2d at 722, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 262, 357 N.E.2d 1035, 1051, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155. A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased. *Mayola v. Alabama* (C.A.5, 1980), 623 F.2d 992, 996. Only in rare cases may prejudice be presumed. *Id*. at 997; see, also, *Nebraska Press Assn. v. Stuart*

(1976), 427 U.S. 539, 554-555, 96 S.Ct. 2791, 2800-2801, 49 L.Ed.2d 683, 694-695.

{¶ 20} In *Landrum, supra,* we concluded that the trial court did not abuse its discretion in denying a Crim.R. 18(B) motion even though "virtually all of the prospective jurors had read or heard media reports about the case." *Id.* at 116, 559 N.E.2d at 722. Landrum cited no specific instances of prejudicial publicity, few jurors recalled learning specific details of the case from pretrial publicity, and none indicated that exposure to publicity would impair his or her ability to deliberate in a fair and impartial manner. *Id.* at 116-117, 559 N.E.2d at 722-723.

{¶ 21} Like Landrum, Treesh has failed to show that the publicity in this case was so pervasive that it impaired the ability of the empaneled jurors to deliberate fairly and impartially. During voir dire, the trial court individually questioned prospective jurors about their exposure to pretrial publicity. Although most empaneled jurors had read or seen articles or television programs about the case, each had been exposed to comparatively little pretrial publicity. Cf. *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479-480, 653 N.E.2d 304, 313-314. Moreover, each empaneled juror confirmed that he or she had not formed an opinion about the guilt or innocence of the accused, or could put aside any opinion, and that he or she could render a fair and impartial verdict based on the law and evidence. Accordingly, appellant's first proposition of law lacks merit.

### B. Prosecutorial Misconduct

{¶ 22} In his seventh and fourteenth propositions of law, Treesh claims that improper statements by the prosecutor during voir dire and closing arguments denied him a fair trial. To address these propositions, we must first determine whether the prosecutor's remarks were improper; if so, we then consider whether the remarks prejudicially affected substantial rights of the accused. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885. We evaluate the allegedly improper statements in the context of the entire trial. *State v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203, 209. An improper comment does not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *Smith, supra,* 14 Ohio St.3d at 15, 14 OBR at 319, 470 N.E.2d at 885.

### 1. Improper Statements During Voir Dire

{¶ 23} Treesh alleges that the prosecutor twice committed misconduct during voir dire. First, during the general voir dire, the prosecutor stated to the potential jurors, "Another thing that would prevent either the State of Ohio or the Defendant from having a fair trial, if you are selected on the jury, is to consider sympathy, sympathy doesn't have a part in the Courtroom. Does everybody understand that, sympathy can't enter your deliberations either?" Defense counsel objected, and the court sustained the objection.

{¶ 24} We agree with the court of appeals that this question by the prosecutor, in spite of defense counsel's sustained objection, was not improper in this context. In *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph three of the syllabus, this court held that an instruction to the jury during sentencing to exclude bias, sympathy, and prejudice is appropriate to ensure that the jurors apply the law, not their emotions. The trial court in this case gave just such an instruction prior to opening arguments. Because sympathy is "irrelevant to the duty of the jurors," *State v. Lorraine* (1993), 66 Ohio St.3d 414,

418, 613 N.E.2d 212, 217, the prosecutor's request was literally correct. Accordingly, the prosecutor's request to the jurors during voir dire to follow the law and disregard sympathy cannot be the basis for a claim of prosecutorial misconduct.

{¶ 25} Treesh next contends that the prosecutor improperly asked the jurors, "[I]f you are convinced beyond a reasonable doubt, according to the law that the judge gives you, the facts of this case, the Defendant is guilty, will you give me your word if that happens, that is proven, you will all return a verdict of guilty?" Defense counsel objected, and the trial court sustained the objection. The court of appeals determined that the prosecutor's request to the jury to make this promise was improper, but concluded that Treesh suffered no prejudice. In his brief to this court, Treesh contends that the prosecutor's request "constituted constitutional misconduct creating an impartial [*sic*] jury," but fails to articulate any basis for that contention. Assuming, without deciding, that this statement by the prosecutor was improper, Treesh has failed to demonstrate how the question affected a substantial right. Accordingly, we overrule appellant's seventh proposition of law.

2. Improper Statements During Closing Argument

{¶ 26} In his fourteenth proposition of law, Treesh argues that several improper comments by the prosecutor during the state's summation denied him a fair trial. Treesh asks this court to review the prosecutor's statements under the plain-error standard set forth in Crim.R. 52(B), but defense counsel preserved an objection to each of the comments addressed in Treesh's merit brief.

{¶ 27} We have previously held that the prosecution is entitled to a certain degree of latitude in summation. *State v. Grant* (1993), 67 Ohio St.3d 465, 482, 620 N.E.2d 50, 68; *State v. Liberatore* (1982), 69 Ohio St.2d 583, 589, 23 O.O.3d 489, 493, 433 N.E.2d 561, 566. The prosecutor may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument. *State v. Smith* (1997), 80 Ohio St.3d 89, 111, 684 N.E.2d 668,

689. We view the state's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial. *State v. Moritz* (1980), 63 Ohio St.2d 150, 157, 17 O.O.3d 92, 97, 407 N.E.2d 1268, 1273.

{¶ 28} First, Treesh challenges the prosecutor's statement to the jury that Treesh wanted them to believe that he unintentionally shot at the police officers who pursued him. Specifically, the prosecutor said, "It's a story that he *concocted* * * *. He wants each one of you to believe that he accidentally killed Henry Dupree, that he mistakenly shot Louis Lauver in the head, *that he unintentionally shot at police officers at E. 174th and Grovewood—*." (Emphasis added.) We agree with the court of appeals that the last clause of these remarks was improper. Treesh himself admitted firing his weapon "at the police, over the tops of the cruisers," and the prosecutor could not deliberately misstate the evidence during summation in order to convince the jury that Treesh "concocted" stories or that his testimony generally lacked credibility. See *State v. Waddy* (1992), 63 Ohio St.3d 424, 436, 588 N.E.2d 819, 829. Even so, the trial court sustained defense counsel's objection, and Treesh has not demonstrated how this comment prejudiced him.

{¶ 29} Second, the prosecutor told the jury that Treesh knew that there was an armed security guard in the store. The court of appeals agreed with appellant and the trial court that this statement was improper, for it found "no evidence that appellant knew of the presence of a security guard before he entered the Vine Street News. In fact, the only testimony relating to this point is that Lauver informed appellant of the existence of the guard." We disagree. At trial, Lauver testified on direct examination that Treesh immediately demanded to know the whereabouts of the "armed security guard." Lauver reiterated this testimony on cross-examination, insisting that Treesh asked specifically about the presence of an armed guard. If the jury believed this portion of Lauver's testimony, it could reasonably infer that Treesh knew about the presence of an armed security guard before he entered the store. Accordingly, the prosecutor's assertion constituted a permissible comment

based on a reasonable inference from trial evidence. See *State v. Grant*, 67 Ohio St.3d at 482, 620 N.E.2d at 68. Assuming, *arguendo*, that this statement was improper, the trial court sustained defense counsel's objection.

{¶ 30} Third, Treesh objects to the prosecutor's assertion that " * * * we can't tell you exactly what happened back there. There is only two people who knew, and one of them is dead right now." Like the court of appeals, we see no impropriety in this statement. Testimony at trial revealed that there were no eyewitnesses to the confrontation between Treesh and Dupree in the rear of the store, and Dupree died immediately thereafter. Though witness Plunkard was in a nearby viewing booth during Treesh's encounter with Dupree and heard gunshots, the booth's door remained closed during the confrontation. Indeed, the prosecutor's comment arguably helped the defense by underscoring a potential weakness in the state's aggravated murder case. Regardless, the trial court sustained defense counsel's objection, and Treesh has failed to demonstrate how this statement prejudiced him.

{¶ 31} Fourth, Treesh contends that the prosecutor "attempted to make a lay witness into an expert on gun residue" in order to dispute the defense's theory that Treesh's gun accidentally discharged during a struggle with Dupree. Treesh refers to the prosecutor's summary of the testimony of Sharon Rosenberg, a forensic scientist: "Sharon Rosenberg testified how the whole front of [Treesh's] T-shirt had no evidence of any type of gun powder residue, fouling, reddish nitrates, yet this gun supposedly is between the two of them the whole time, going off six times, you've got the [one] falling on the other, surely he'd have some fouling or some kind of gunshot residue on his shirt. There is none—." Like the court of appeals, we do not find this statement improper. The prosecutor neither misstated Rosenberg's testimony nor exaggerated her credentials. Instead, the prosecutor merely suggested a reasonable inference that the jury could draw from Rosenberg's testimony and other trial evidence. "Prosecutors are entitled to latitude as to what

the evidence has shown and what inferences can reasonably be drawn from the evidence." *Smith, supra,* 80 Ohio St.3d at 111, 684 N.E.2d at 689. Regardless, the trial court sustained defense counsel's objection to this statement and Treesh again has failed to demonstrate how this statement affected a substantial right.

{¶ 32} Fifth, Treesh claims that the prosecutor improperly commented upon the truth of appellant's testimony by stating, "I suggest to you that the Defendant told the truth twice. He told the truth when he said he went up and I plugged— excuse me—not plugged." We agree with the court of appeals that the prosecutor's statement was improper, since Treesh testified only that he "poked" Dupree. But even though the prosecutor mistakenly used the word "plugged" instead of "poked," the prosecutor corrected himself, the trial court sustained defense counsel's objection, the court provided a curative instruction, and Treesh has failed to demonstrate that he suffered prejudice as a result of the prosecutor's unfinished thought.

{¶ 33} Sixth, Treesh contends that the prosecutor committed prejudicial misconduct by suggesting to the jury, "If you are not satisfied with the way the investigation went, or do you think it could have been done better, give us a call after the trial is over, drop us a letter—." The trial court sustained defense counsel's objection. Like the court of appeals, we deem this statement improper and not based upon the evidence. Even so, we agree with the court below that it did not impair appellant's right to a fair trial.

{¶ 34} We have reviewed the closing argument in its entirety to determine whether prejudicial error occurred. *State v. Frazier* (1995), 73 Ohio St.3d 323, 342, 652 N.E.2d 1000, 1016; *Moritz, supra,* 63 Ohio St.2d at 157, 17 O.O.3d at 97, 407 N.E.2d at 1273. We conclude that the few improper statements made by the prosecutor during closing arguments did not permeate the state's argument so as to deny Treesh a fair trial. See *State v. Landrum, supra,* 53 Ohio St.3d at 110-113, 559 N.E.2d at 716-719; *State v. Bey* (1999), 85 Ohio St.3d 487, 495, 709 N.E.2d

484, 494. The trial court sustained each of defense counsel's objections. Accordingly, we overrule appellant's fourteenth proposition of law.

### C. Failure to Excuse Juror Volke for Cause

{¶ 35} In his eighth proposition of law, Treesh contends that the inclusion of juror Lynn Volke denied him his constitutional right to a fair and impartial jury due to Volke's "unbending position" in support of the death penalty. For the following reasons, we disagree. R.C. 2945.25(C) provides that a prospective juror in a capital punishment case may be challenged for cause where "he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case. A prospective juror's conscientious or religious opposition to the death penalty in and of itself is not grounds for a challenge for cause. All parties shall be given wide latitude in voir dire questioning in this regard."

{¶ 36} We have held that " '[a] juror who will automatically vote for the death penalty *in every case* will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. * * * [A] capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.' " (Emphasis added.) *State v. Williams* (1997), 79 Ohio St.3d 1, 6, 679 N.E.2d 646, 653, quoting *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 2229-2230, 119 L.Ed.2d 492, 502-503. This court has also noted, however, that even if a juror shows a *predisposition* in favor of imposing the death penalty, the trial court does not abuse its discretion in overruling a challenge for cause if the juror later states that she will follow the law and the court's instructions. *State v. Mack* (1995), 73 Ohio St.3d 502, 510, 653 N.E.2d 329, 336.

{¶ 37} Juror Volke did initially reveal a predisposition in favor of the death penalty. When the court questioned Volke regarding her opinion of the death

penalty, Volke said, "I believe in it."  When the assistant prosecutor asked Volke if the state's decision to seek the death penalty offended her in any way, Volke replied, "No, not at all."  Defense counsel then asked Volke why she believed in the death penalty, and Volke responded, "I think if someone takes another person's life they should give their life up."  When defense counsel continued, "And would that be—do you believe that would be in every case or in some cases?" Volke replied, "*No, in every case.*"  (Emphasis added.)

{¶ 38} If the voir dire of juror Volke had simply ended here, we assume, without deciding, that her inclusion in the jury panel would have violated R.C. 2945.25(C) and this court's decision in *Williams, supra,* 79 Ohio St.3d 1, 679 N.E.2d 646.  Our *Williams* decision, after all, precludes the state from executing an offender when one of the empaneled jurors would "automatically vote for the death penalty *in every case*."  (Emphasis added.) *Id.* at 6, 679 N.E.2d at 653.  But as voir dire continued, Volke stated that she had been confused by earlier questions and insisted that she would follow the law and the court's instructions. After being asked several searching follow-up questions by the court, the assistant prosecutor, and defense counsel, juror Volke specifically indicated on more than one occasion that she could consider mitigating circumstances and impose a lesser sentence under appropriate circumstances.  Juror Volke's inclusion in the jury, therefore, did not violate *Williams* and was consistent with this court's decision in *State v. Mack, supra.*  Accordingly, we overrule appellant's eighth proposition of law.

14

D.  Admissibility of Statements Following Arrest

{¶ 39} Before trial, Treesh filed a motion to suppress all statements he had made while in the custody of the Eastlake Police Department.  The motion also included a challenge to the department's "show-up" identification.  The trial court held a hearing on the motion to suppress, at which Treesh's attorney withdrew his challenge to the show-up identification.  After the suppression hearing, the trial court denied the motion to suppress.  Treesh now contends that the evidence at the suppression hearing established "without doubt" that he never received proper *Miranda* warnings prior to his custodial interrogation and that the interrogation persisted despite his request for counsel.  We disagree on both counts.

1.  Adequacy of *Miranda* Warnings

{¶ 40} The United States Supreme Court has recently reaffirmed its decision in *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, concluding that *Miranda* "announced a constitutional rule," and that "*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture." *Dickerson v. United States* (2000), 530 U.S. ___, ___, 120 S.Ct. 2326, 2336, 147 L.Ed.2d 405, 419.  Accordingly, the admissibility of any statement given during custodial interrogation of a suspect depends on whether the police provided the suspect with four warnings:  (1) that the suspect has the right to remain silent, (2) that anything he says can be used against him in a court of law, (3) that he has the right to the presence of an attorney, and (4) that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires.  *Id.,* citing *Miranda, supra,* 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

{¶ 41} It is well established that a defendant who is subjected to custodial interrogation must be advised of his or her *Miranda* rights and make a knowing and intelligent waiver of those rights before statements obtained during the interrogation will be admissible.  It is also well established, however, that a suspect

who receives adequate *Miranda* warnings prior to a custodial interrogation need not be warned again before each subsequent interrogation. *Wyrick v. Fields* (1982), 459 U.S. 42, 48-49, 103 S.Ct. 394, 396-397, 74 L.Ed.2d 214, 219; *State v. Barnes* (1986), 25 Ohio St.3d 203, 208, 25 OBR 266, 270, 495 N.E.2d 922, 926; see, also, *State v. Brewer* (1990), 48 Ohio St.3d 50, 58-59, 549 N.E.2d 491, 500-501. Police are not required to readminister the *Miranda* warnings when a relatively short period of time has elapsed since the initial warnings. *State v. Mack*, 73 Ohio St.3d at 513-514, 653 N.E.2d at 338. Courts look to the totality of the circumstances when deciding whether initial warnings remain effective for subsequent interrogations. *State v. Roberts* (1987), 32 Ohio St.3d 225, 232, 513 N.E.2d 720, 725.

{¶ 42} In *Barnes, supra,* the defendant sought to suppress inculpatory statements made twenty-four hours after being advised of his *Miranda* rights. We concluded that "[a]lthough re-reading appellant's rights to him * * * would have been an extra precaution, it is not one mandated by the Ohio or United States Constitutions." *Id.,* 25 Ohio St.3d at 208, 25 OBR at 270, 495 N.E.2d at 926. In *Brewer, supra,* the suspect received *Miranda* warnings from one police department early in the evening and made inculpatory statements to officers of a different police department the following day without being readvised of his *Miranda* rights. We noted that while a "great deal of time" had elapsed since the original *Miranda* warnings, the subsequent interrogation was "part of a series of discussions" that appellant had with police, during which the appellant had indicated his awareness of his rights. *Id.,* 48 Ohio St.3d at 60, 549 N.E.2d at 501. Accordingly, based on the totality of the circumstances, no new warnings were required. *Id.*

{¶ 43} In this case, Treesh was arrested just after midnight on the night of the robbery. The arresting officer, then a five-year veteran of the Cleveland Police Department, testified that he advised Treesh of his *Miranda* rights as Treesh was being handcuffed. When asked to specify exactly what he said, the officer recited

16

the four warnings required by *Miranda*. The officer testified that he asked Treesh if he understood those rights. When Treesh did not respond, the officer began to repeat the warnings until Treesh "turned and said, 'Yeah, yeah, I know.' " On cross-examination, Treesh's attorney questioned whether the officer had, in fact, recited the appropriate warnings, and the officer responded, "Sir, I make it a point to mirandize everybody I arrest." For his part, Treesh testified at the suppression hearing that no one administered *Miranda* rights at the scene of his arrest.

{¶ 44} Treesh arrived at the Eastlake Police Department less than three hours later and was immediately taken to a booking room. Lieutenant Thomas Doyle testified that he was in the booking room when Treesh entered, and that he immediately advised Treesh of his *Miranda* rights. The booking room was equipped with a video recorder. According to the transcript of the voice-enhanced booking-room videotape, however, Doyle's rewarning was incomplete. Doyle asked Treesh, "Do you understand your *Miranda* rights? I'm going to ask you some questions for the next hour or so, two hours or three hours. You have the right to answer the questions that I ask. Stop me any time. [Inaudible] Do you understand that? Okay." According to Doyle, Treesh did not appear under the influence of drugs or alcohol, and indicated a willingness to talk.

{¶ 45} Treesh agreed to talk to Doyle and was questioned, with interruptions, for the next several hours. At 7:40 that morning, an FBI agent came to Eastlake to question Treesh. He advised Treesh of his rights, and asked him if he wanted to waive those rights. Treesh read the waiver form and signed it, and later signed another waiver form in which Doyle was listed as the warning officer. On at least two occasions during this series of interviews, Treesh verbally indicated an awareness of his rights. When Doyle woke Treesh at 6:57 a.m., he asked Treesh to recite his rights, and Treesh said, "I have the right to remain silent. Anything I say can and will be used against me in a court of law, blasé, blasé, blasé." [*Sic.*]

Later, Doyle attempted to warn him again of his rights, and Treesh said, "You told me this before. * * * I already know all my rights."

{¶ 46} The dissenting judge on the appellate panel concluded, and we agree, that the warnings Doyle first conveyed to Treesh upon his arrival at Eastlake were "a far cry from the information required to be conveyed to an accused. Appellant's 'rights' did not include an obligation, as stated to him at the Eastlake Police Station, to answer the officer's questions." O'Neill, J., dissenting, at 2. Doyle misstated Treesh's right to silence and neglected to inform Treesh that any statement could be used against him in court. And Doyle failed to specifically mention that Treesh had the right to have an attorney present during interrogation.

{¶ 47} Even so, we disagree with the dissenting judge's conclusion that Doyle's inadequate readvisement of rights at Eastlake compels reversal. On the authority of *Roberts, Barnes,* and *Brewer, supra,* we agree instead with the majority of the court of appeals that "the first partial re-warning given by Doyle at approximately 2:28 a.m. was sufficient in light of [the arresting officer's] earlier warning" that occurred just two hours before Treesh's arrival at Eastlake. Accord *Mack, supra,* 73 Ohio St.3d at 512-514, 653 N.E.2d at 338; *State v. Groves* (Mo.1983), 646 S.W.2d 82; *Evans v. McCotter* (C.A.5, 1986), 790 F.2d 1232, 1237-1238. Though the testimony at the suppression hearing conflicted as to whether the arresting officer actually recited the *Miranda* warnings, the trial court implicitly found the arresting officer's testimony about the arrest more credible than Treesh's. Weight of evidence and credibility of witnesses are primarily for the trier of fact— a principle applicable to suppression hearings as well as trials. *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 58, 437 N.E.2d 583, 584. We will not substitute our judgment for that of the trial court on this issue. The full arrest warning, viewed in conjunction with the partial rewarnings at the interrogations, indicates that Treesh was sufficiently apprised of his *Miranda* rights.

2. Voluntariness of Waiver

18

{¶ 48} Treesh contends that regardless of the adequacy of the *Miranda* warnings, his waiver of those rights was not voluntary. "While voluntary waiver and voluntary confession are separate issues, the same test is used to determine both, *i.e.,* whether the action was voluntary under the totality of the circumstances." *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 854. "In *Colorado v. Connelly* (1986), 479 U.S. 157 [107 S.Ct. 515, 93 L.Ed.2d 473], the court held that 'police overreaching' is a prerequisite to a finding of involuntariness. Evidence of use by the interrogators of an inherently coercive tactic (*e.g.,* physical abuse, threats, deprivation of food, medical treatment, or sleep) will trigger the totality of the circumstances analysis." *Id.* Accordingly, we need not assess the totality of the circumstances unless we find that the tactics used by the detectives were coercive. *Id.*

{¶ 49} In *Clark, supra,* the appellant alleged that his mental condition negated his capacity to act voluntarily. This court determined, however, that assessment of the totality of the circumstances was unnecessary. *Id.* Officers allowed the appellant to use the restroom, provided coffee and cigarettes, and made no threats or promises. Though assessment of the totality of the circumstances was unnecessary, this court examined the totality of the circumstances anyway and concluded that appellant voluntarily gave his waiver and confession. *Id.* Though the defense contended that brain damage from a suicide attempt impaired appellant's ability to make choices, the appellant acknowledged several times that he understood his rights and signed a written waiver. *Id.*

{¶ 50} Here, Treesh contends that his "tiredness," and "cocaine high" impaired his capacity to make informed decisions during the interrogation and that the officers never once asked him if he wanted to stop and rest. But like the court of appeals, we find no coercive police conduct that would trigger the totality-of-the-circumstances test. Testimony at the suppression hearing reveals that Treesh was permitted to sleep during breaks in the interrogation. The transcript of the

booking-room videotape confirms that Treesh spoke coherently and was aware of his surroundings. Treesh was offered coffee and other refreshments on multiple occasions, as well as lotion soap and a disinfectant for a small wound. Like the appellant in *Clark, supra,* Treesh read and signed a written waiver and indicated on several occasions that he understood his rights. Assuming, *arguendo*, that assessment of the totality of the circumstances is necessary in this case, we cannot say that appellant's waiver was improperly obtained.

### 3. *Minnick/Edwards*—Request for Counsel

{¶ 51} Treesh also argues that questioning continued despite requests for counsel. It is axiomatic that "an accused who requests an attorney, 'having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.' " *Minnick v. Mississippi* (1990)*,* 498 U.S. 146, 150, 111 S.Ct. 486, 489, 112 L.Ed.2d 489, 496, quoting *Edwards v. Arizona* (1981), 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386; see, also, *State v. Dunlap* (1995), 73 Ohio St.3d 308, 313, 652 N.E.2d 988, 994; *State v. Knuckles* (1992), 65 Ohio St.3d 494, 605 N.E.2d 54, paragraph one of the syllabus. In *Knuckles*, this court noted that the threshold inquiry is " 'whether the accused actually invoked his right to counsel.' " *Id.* at 496, 605 N.E.2d at 55, quoting *Smith v. Illinois* (1984), 469 U.S. 91, 95, 105 S.Ct. 490, 492-493, 83 L.Ed.2d 488, 493-494.

{¶ 52} Here, Treesh testified that he asked for counsel immediately after his arrival at Eastlake. According to Doyle, however, Treesh never requested an attorney until 2 p.m., when Doyle confronted Treesh and Brooks with the store clerk's statement. At that point, according to Doyle, Treesh and Brooks conferred, and "decided that they wanted to have a prosecutor and an attorney present * * * and they'd only give statements that was [*sic*] possible to get out of the death

penalty." Doyle responded that there would be no deals struck in return for a statement, and that no prosecutor was coming down. Treesh and Brooks then refused to discuss the Eastlake crime any further, but continued to discuss other matters.

{¶ 53} Treesh's desire for the presence of an attorney appeared to be for the limited purpose of making a deal with the prosecutor to avoid the death penalty. Assuming that Treesh's request was an invocation of counsel for purposes of *Edwards*, the interrogating officers treated it as such. The officers did not attempt to elicit any further statements regarding the Eastlake case from Treesh, and Treesh willingly spoke about other crimes.

E. Interrogation/Destruction of Evidence

{¶ 54} In his third proposition of law, appellant reasserts two claims that originally appeared in an unsuccessful pretrial motion to dismiss. Treesh claims that (1) structural error occurred when he was interviewed in jail by a corrections officer without counsel present, and (2) the state's failure to preserve certain evidence from the scene of the crime denied him a fair trial. For the following reasons, we disagree.

1. Conversations with Corrections Officer Bowersock

{¶ 55} Regarding Treesh's first contention, defense counsel urged the court at a pretrial conference to dismiss the case on the basis of structural error. The defense contended that the Eastlake Police Department arranged for corrections officer Chris Bowersock (also a part-time Eastlake police officer) to interview Treesh without counsel present and obtain information that the state would later use against Treesh, knowing full well that Treesh was already represented by counsel. At a pretrial conference on the motion, the prosecutor professed ignorance about any such arrangement and insisted that Treesh initiated all conversations with Bowersock and discussed only crimes unrelated to the Eastlake robbery.

{¶ 56} Though the trial court expressed concerns about the propriety of Bowersock's conversations with Treesh, the court ultimately denied appellant's motion to dismiss, noting that it had already granted appellant's motion *in limine* to prohibit the state from permitting "any witness to address any questions concerning other acts other than the Eastlake crime." We agree with the trial court's resolution of this issue. The trial court excluded evidence of crimes committed by Treesh in other states, the state did not attempt to introduce any testimony by Bowersock in its case in chief, and the state did not introduce any of Treesh's statements to Bowersock. Assuming, *arguendo*, that Bowersock's conversations with Treesh were improper, Treesh suffered no prejudice.

2. Failure to Preserve Evidence

{¶ 57} Turning to Treesh's evidentiary claims, defense counsel alleged that the police either destroyed or failed to preserve certain key pieces of evidence from the scene of the robbery. These included a nylon holster, a ramp, several wall panels and doors, Dupree's handcuffs, and Dupree's handgun. It is axiomatic that "[s]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215, 218. "In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether the evidence is specifically, generally or not at all requested by the defense." *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus, following *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. "[U]nless a criminal defendant can show

22

bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood* (1988), 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289. In the instant case, there is no support in the record for Treesh's allegations that the state suppressed material evidence or acted in bad faith in failing to preserve potentially useful evidence.

{¶ 58} The nylon holster was inadvertently destroyed by Daniel Terriaco, the manager of the Vine Street News, after the police had finished processing the scene. By that time, however, an employee of the Lake County Regional Forensic Laboratory had already photographed the holster and its location on the floor. According to Terriaco, he was distraught by the large amounts of blood in the store, found the holster while cleaning, and threw it away without realizing what it was. Mitchell Wisniewski, a firearms expert employed by the Lake County Regional Forensic Laboratory, testified that he chose not to collect the holster from the scene because he would not have been performing comparison tests on it, and because it was his understanding that Eastlake police would collect the holster after the Lake County crime lab finished processing the crime scene. Apparently, Eastlake never retrieved the holster. Even so, we perceive no prejudice to appellant resulting from the inadvertent destruction of the holster. Photographs taken by David Green of the Lake County crime lab were disclosed to defense counsel during discovery and utilized by the defense at trial.

{¶ 59} Appellant also alleges that he was denied a fair trial because the state failed to maintain as evidence a floor ramp that connected the rear of the Vine Street News with the video arcade area. Lieutenant Doyle testified that he had returned to the Vine Street News after the crime in order to investigate Treesh's claim that Dupree had fired a weapon at him. At that time, Doyle recovered a spent nine-millimeter bullet from the ramp and turned it over to the Lake County crime lab. Later, the store manager destroyed the ramp while cleaning the store. We discern

no prejudice to Treesh resulting from the store manager's destruction of the ramp. Photographs depicting the ramp and indicating the location where the bullet penetrated the ramp were introduced at trial and adequately preserved the ramp's evidentiary value. See Crim.R. 26. The state disclosed still photographs and a videotape of the entire crime scene to defense counsel prior to trial, as well as the spent bullets and casings recovered from the scene. Moreover, testimony at trial revealed that the bullet Doyle recovered from the ramp came from Treesh's nine-millimeter handgun, not Dupree's .25 caliber weapon.

{¶ 60} Treesh also contends that the failure to preserve certain wall panels and doors where bullets had been found rendered it impossible to reconstruct the precise trajectory of bullets fired. But the police took photographs and videotapes indicating the location of the spent bullets and casings in the store, and disclosed this information to the defense. See Crim.R. 26. Measurements of the entire store, including the location of the spent bullets and casings, were taken by Officer Wisniewski at the scene. Based on this information, Treesh's own investigator constructed a detailed shadowbox reconstruction of the crime scene prior to trial, which included angles of fired bullets. At trial, Officer Wisniewski testified at length regarding the locations of the spent bullets and casings. Accordingly, Treesh suffered no prejudice from the state's failure to preserve the wall panels and doors from the Vine Street News.

{¶ 61} Finally, Treesh contends that the state "failed to adequately preserve" Dupree's handcuffs and .25 caliber handgun. Like the court of appeals, we disagree. The handcuffs were attached to the belt or belt loops of Dupree's security uniform, which was taken to the Cuyahoga County Coroner for testing. The .25 caliber handgun fell out of the back pocket of Dupree's pants at the hospital. Eastlake police turned the gun over to the Lake County Prosecutor. The state disclosed the existence of both the handcuffs and the .25 caliber handgun to the defense in a discovery response filed October 11, 1994, and the defense had the

24

opportunity to conduct its own testing of the items. Accordingly, we overrule appellant's third proposition of law.

### F. Request for Grand Jury Transcripts

**{¶ 62}** In his fourth proposition of law, Treesh asserts that the trial court erred when it denied him access to the record of grand jury proceedings. We disagree. This court has recognized a limited exception to the general rule in favor of grand jury secrecy, holding that an accused is not entitled to review the transcript of grand jury proceedings "unless the ends of justice require it and there is a showing by the defense that a *particularized need* for disclosure exists which outweighs the need for secrecy." (Emphasis added.) *State v. Greer* (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, paragraph two of the syllabus. "Whether particularized need for disclosure of grand jury testimony is shown is a question of fact; but, generally, it is shown where from a consideration of all the surrounding circumstances it is probable that the failure to disclose the testimony will deprive the defendant of a fair adjudication of the allegations placed in issue by the witness' trial testimony." *Id.*, paragraph three of the syllabus. See, also, *State v. Sellards* (1985), 17 Ohio St.3d 169, 173, 17 OBR 410, 413, 478 N.E.2d 781, 785. This is a matter within the trial court's discretion. *Greer, supra,* 66 Ohio St.2d at 148, 20 O.O.3d at 163, 420 N.E.2d at 988. In *Sellards*, *supra,* the accused demonstrated a particularized need to inspect relevant portions of grand jury testimony because inspection was necessary to prove the accused's claim that the prosecution intentionally withheld specific material information from the defense—a claim itself borne out by trial testimony. *Sellards,* 17 Ohio St.3d at 173, 17 OBR at 413, 478 N.E.2d at 785-786.

**{¶ 63}** Attempting to articulate a particularized need here, Treesh asserts that "all information therein [was] needed to properly and fully prepare his defense. * * * The Appellant, in a capital murder matter, should have been permitted copies of the grand jury transcript to allow him to best fully prepare his defense." Treesh

thus implies that the severity of the potential penalty, without more, results in a particularized need for the grand jury transcripts. We disagree. Though *Greer* itself was not a death-penalty case, this court has applied *Greer* to capital cases, and rejected assertions of particularized need when appellants failed to meet their burden to specify that need or demonstrate how nondisclosure deprived them of a fair trial. See, *e.g.*, *State v. Benge* (1996), 75 Ohio St.3d 136, 145, 661 N.E.2d 1019, 1028; *State v. Lawson* (1992), 64 Ohio St.3d 336, 345, 595 N.E.2d 902, 909-910.

{¶ 64} In his original motion for a transcript of grand jury proceedings, Treesh was more specific than in his brief to this court, asserting that he required the grand jury testimony of Benjamin Brooks. But as the court of appeals noted, Brooks never testified at trial, and Treesh has failed to establish that he had a particularized need for the disclosure of the grand jury record. The trial court did not abuse its discretion when it overruled Treesh's motion for a transcript of grand jury proceedings. Accordingly, Treesh's fourth proposition of law lacks merit.

G. Request for Daily Trial Transcripts

{¶ 65} In his fifth proposition of law, Treesh contends that as a death-penalty defendant, he was "entitled by law" to have daily transcripts of all proceedings provided to him. Treesh filed a pretrial motion for daily transcripts. In its response, the state recognized that Treesh would be entitled to a transcript for purposes of appeal, but urged the court to deny Treesh's request for daily transcripts in favor of a "wait and see" approach. The trial court denied Treesh's motion for daily transcripts in a journal entry disposing of several other pretrial matters. In his brief to this court, Treesh asserts that due to his need for thorough and ongoing investigation and trial preparation, his need for an adequate defense, the seriousness of the offense, the severity of his potential punishment, and his constitutional right to confrontation, the trial court improperly overruled his motion for daily transcripts. We disagree.

26

**{¶ 66}** The United States Supreme Court has held that "the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners. While the outer limits of that principle are not clear, there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal." *Britt v. North Carolina* (1971), 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400, 403. We explicitly followed *Britt* in *State v. Arrington* (1975), 42 Ohio St.2d 114, 71 O.O.2d 81, 326 N.E.2d 667, paragraph one of the syllabus.

**{¶ 67}** Though appellant relies on *Britt* to support his alleged entitlement to daily transcripts, *Britt* simply does not require that a capital defendant be provided with transcripts of each day's testimony as trial proceeds. *United States v. Sliker* (C.A.2, 1984), 751 F.2d 477, 491 (holding that even in light of *Britt*, denial of defendant's request for daily transcripts was not an abuse of discretion or denial of defendant's constitutional rights). "Common experience informs us that it is entirely practicable to present an effective defense in a criminal case without daily copy, however convenient daily copy undoubtedly is." *Id.* See, also, *United States v. Rucker* (C.A.2, 1978), 586 F.2d 899, 905 (finding no constitutional deprivation due to denial of daily transcripts). The Constitution does not require that indigent defendants be furnished with every possible legal tool, "no matter how speculative its value, and no matter how devoid of assistance it may be, merely because a person of unlimited means might choose to waste his resources." *United States v. MacCollom* (1976), 426 U.S. 317, 330, 96 S.Ct. 2086, 2093, 48 L.Ed.2d 666, 667 (Blackmun, J., concurring).

**{¶ 68}** Assuming, *arguendo*, that the trial court erred by denying Treesh's motion for daily transcripts, Treesh has failed to articulate any specific prejudice resulting from a lack of access to such transcripts, and we discern none. Accord *Thomason v. State* (1997), 268 Ga. 298, 312, 486 S.E.2d 861, 873. Treesh

apparently seeks a *per se* rule requiring the provision of daily transcripts to all capital defendants, but we decline to extend *Britt* beyond the factual circumstances recognized by the Supreme Court. Cf. *Harris v. Stovall* (C.A.6, 2000), 212 F.3d 940, 945 (rejecting defendant's contention that *Britt* entitled him to transcripts from his accomplice's trial). Accordingly, we overrule appellant's fifth proposition of law.

### H. Elicitation of Treesh's Request for an Attorney

{¶ 69} In his eleventh proposition of law, Treesh contends that the trial court erred when it failed to grant a motion for mistrial made during the direct examination of Detective Doyle. Doyle, the investigating officer in charge of Treesh's case, interviewed Treesh and Brooks at Eastlake following their arrest. At the stationhouse, Doyle confronted Treesh and Brooks with the taped statement of the store clerk.

{¶ 70} At trial, the prosecutor asked Doyle what happened after Treesh heard Lauver's taped statement. Defense counsel immediately objected, fearing that the prosecutor was trying to elicit Treesh's request for an attorney. At sidebar, the prosecutor assured counsel that he was seeking testimony only about Treesh's request to make a deal—"nothing to do with counsel." But following the sidebar, when the prosecutor again asked Doyle what Treesh said after hearing Lauver's statement, Doyle answered, "he wanted a prosecutor to be present and he wanted an attorney." Defense counsel immediately objected, and the court sustained the objection and provided a curative instruction. At sidebar, the prosecutor said "that was a surprise to me." The following day, the defense made a motion for mistrial, which the trial court denied.

{¶ 71} We agree with appellant that it was improper for the prosecutor to elicit Doyle's testimony that Treesh had asked for an attorney. An accused who asserts his Fifth Amendment right to silence should not have the assertion of that constitutional right used against him. *Doyle v. Ohio* (1976), 426 U.S. 610, 96 S.Ct.

28

2240, 49 L.Ed.2d 91. Since *Doyle*, the United States Supreme Court has clarified that "with respect to post-*Miranda* warnings 'silence,' * * * silence does not mean only muteness; it includes the statement of a desire to remain silent, *as well as of a desire to remain silent until an attorney has been consulted*." (Emphasis added.) *Wainwright v. Greenfield* (1986), 474 U.S. 284, 295, 106 S.Ct. 634, 640, 88 L.Ed.2d 623, 632, fn. 13. Here, we agree with the court of appeals' view that "the inference that a juror could draw from Doyle's statement, is that appellant asked for an attorney after being confronted with the audio tape recording *because he was guilty*. Consequently, the admission of this statement could bear on whether a juror could entertain a reasonable doubt as to appellant's guilt." (Emphasis added.)

{¶ 72} The prosecutor's improper elicitation of testimony regarding Treesh's request for an attorney is especially troubling because defense counsel and the court had specifically warned the prosecutor to avoid the problem even before it occurred. Even so, we must determine whether Doyle's statement resulted in prejudicial error warranting reversal. See *Hayton v. Egeler* (C.A.6, 1977), 555 F.2d 599 (prosecutor's attempt to impeach petitioner's alibi testimony by inquiring about postarrest silence was erroneous, but harmless error beyond a reasonable doubt).

{¶ 73} The granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. Crim.R. 33; *State v. Sage* (1987), 31 Ohio St.3d 173, 182, 31 OBR 375, 382, 510 N.E.2d 343, 349-350. "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened * * *." *State v. Reynolds* (1988), 49 Ohio App.3d 27, 33, 550 N.E.2d 490, 497. The granting of a mistrial is necessary only when a fair trial is no longer possible. *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1, 9. A single comment by a police officer as to a suspect's silence without any suggestion that the jury infer guilt from the silence constitutes harmless error. See *Meeks v. Havener* (C.A.6, 1976), 545 F.2d 9, 10.

**{¶ 74}** Here, the trial court immediately instructed the jury that "the fact that the Defendant requested an attorney is his Constitutional right to request one and cannot be used against him in any way." We presume that the jury followed the court's instructions, including instructions to disregard testimony. *State v. Loza* (1994), 71 Ohio St.3d 61, 75, 641 N.E.2d 1082, 1100; *State v. Zuern* (1987), 32 Ohio St.3d 56, 61, 512 N.E.2d 585, 590. Given the context of the prosecutor's question to Doyle and the curative instruction by the court, we conclude that the trial court did not abuse its discretion in denying appellant's motion for mistrial. Accordingly, we overrule appellant's eleventh proposition of law.

I. Improper Cross-Examination

**{¶ 75}** In his ninth proposition of law, Treesh argues that the prosecutor "engaged in improper and highly prejudicial questioning of witnesses and in making prejudicial comments to the jury." Treesh, who took the stand in his own defense, refers specifically to alleged improprieties that occurred during his cross-examination by the state. We find no merit to these contentions.

**{¶ 76}** Again, the standard for prosecutorial misconduct is whether the comments and/or questions were improper, and, if so, whether they prejudiced appellant's substantial rights. *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, 300. Evid.R. 611(B) provides that cross-examination shall be permitted on all relevant matters and matters affecting credibility. "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." *State v. Acre* (1983), 6 Ohio St.3d 140, 145, 6 OBR 197, 201, 451 N.E.2d 802, 806. Trial judges may impose reasonable limits on cross-examination based on a variety of concerns, such as harassment, prejudice, confusion of the issues, the witness's safety, repetitive testimony, or marginally relevant interrogation. See *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683.

{¶ 77} First, Treesh contends that the prosecutor improperly badgered him about his inability to recall the exact position that he was in when his gun first discharged in the rear of the store. Though the trial court sustained defense counsel's objection, we agree with the court of appeals that the prosecutor's query cannot be the basis for a claim of prosecutorial misconduct, because appellant's recollection of the precise sequence of events in the rear of the store was a proper subject for cross-examination. See *State v. Pinkney* (1988), 36 Ohio St.3d 190, 193, 522 N.E.2d 555, 558.

{¶ 78} Second, Treesh contends that the prosecutor improperly "tried to question the Appellant in front of the jury about the witness Kelli Hobbs, which the trial court specifically excluded." Like the court of appeals, however, we find no attempt by the prosecution to elicit testimony relating to Hobbs. In the portion of the record cited by Treesh, although the prosecutor did indeed mention Hobbs, this did not occur in front of the jury, but during a sidebar discussion when the trial judge specifically warned the prosecutor to avoid eliciting testimony about other acts.

{¶ 79} Third, Treesh contends that the prosecutor improperly exceeded the scope of cross-examination by asking Treesh about events that occurred on the day before the shooting. The court of appeals disagreed, noting that Ohio does not follow the federal rule with respect to the scope of cross-examination. In Ohio, cross-examination is not limited to the subject matter of direct examination. Compare Evid.R. 611(B) with Fed.R.Evid. 611(b). It is available for all matters pertinent to the case that the party calling the witness would have been entitled or required to raise. *Smith v. State* (1932), 125 Ohio St. 137, 180 N.E. 695, paragraph one of the syllabus. Here, the prosecutor's few general questions concerning Treesh's activities on the day before the robbery merely clarified Treesh's own testimony that he had been smoking cocaine in the Cleveland area before the Vine

Street robbery. We find no merit in appellant's contention that these questions denied Treesh a fair trial.

{¶ 80} Finally, Treesh argues that the prosecutor improperly and repeatedly questioned him regarding civilians present during Treesh's flight from police. It is true that during cross-examination, the prosecutor asked Treesh whether he saw civilians in the area as he and Harth ran from pursuing police officers. We note that Treesh failed to object to the prosecutor's first several questions about civilians. Regardless, it is unclear from Treesh's proposition how these questions in any way prejudiced him.

{¶ 81} We have reviewed the state's cross-examination of Treesh in its entirety. Though the prosecutor occasionally repeated questions and at times seemed unnecessarily contentious, defense counsel objected and the trial court sustained the objections where appropriate. Eventually, the trial court specifically limited the scope of cross-examination and specifically warned the prosecutor not to "keep trying to put words in [Treesh's] mouth." We find that the trial court properly controlled the cross-examination of Treesh, and it cannot be said that the prosecutor's method of cross-examination denied Treesh a fair trial. Accordingly, we overrule appellant's ninth proposition of law.

### J. Prior Bad Acts

{¶ 82} The thirteenth proposition of law also concerns the state's cross-examination of Treesh. Treesh contends that the trial court should have declared a mistrial after the prosecutor "tried to introduce evidence of prior acts of Appellant." Treesh's proposition is based on the following exchange:

"[Prosecutor:] And when you asked the Eastlake police if you were charged with murder one, you knew what it meant?

"[Appellant:] I thought it was the highest degree.

"[Prosecutor:] Well, now, you knew about the different levels of murder one, of murder, didn't you?

"[Appellant:] Are you telling me what I know?

"[Prosecutor:] No, I am asking, didn't you know?

"[Appellant:] No, I didn't.

"[Prosecutor:] Well, you testified on direct that you had previous convictions?

"[Appellant:] Yes sir, I did."

**{¶ 83}** Defense counsel objected. The trial court sustained the objection, and ordered the prosecutor to abandon this line of questioning. Shortly thereafter, the trial court overruled appellant's motion for mistrial.

**{¶ 84}** In his brief, Treesh contends that "[i]t is unequivocally clear that the prosecutor was attempting to prove, through prior convictions, the character of the appellant in order to show that he acted in conformity therewith in violation of Rule 404(B) of the Ohio Rules of Evidence." This rule provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." See, also, *State v. Woodard* (1993), 68 Ohio St.3d 70, 73, 623 N.E.2d 75, 78, citing *State v. Wickline* (1990), 50 Ohio St.3d 114, 120, 552 N.E.2d 913, 920.

**{¶ 85}** Here, because the trial court immediately sustained defense counsel's objection and prohibited the prosecutor from pursuing this line of inquiry, the trial court did not err in overruling Treesh's motion for a mistrial. As we noted above, the granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Garner* (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623, 634. On direct examination, Treesh had already admitted to prior convictions for the felonies of receiving stolen property, forgery, and burglary. The prosecutor's question on cross-examination merely asked Treesh to confirm that prior testimony. Since the trial court sustained the objection to this question, no further bad acts testimony was admitted, avoiding any potential violation of Evid.R. 404(B).

**{¶ 86}** Treesh cites our *Lytle* decision for the proposition that the improper use of other-acts evidence necessitates reversal when there is a "reasonable possibility that the testimony contributed to the accused's conviction." *State v. Lytle* (1976), 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623, paragraph three of the syllabus. Upon consideration of the record as a whole, "we believe it most unlikely that the 'other act' testimony contributed in any noticeable degree" to Treesh's convictions. *Id.*, 48 Ohio St.2d at 403, 2 O.O.3d at 502, 358 N.E.2d at 631. Accordingly, we overrule appellant's thirteenth proposition of law.

K.  Gruesome Photographs

**{¶ 87}** In his twelfth proposition of law, Treesh contends that the trial court erred when it admitted, over objection, allegedly gruesome photographs of the victims in this case. Initially, we note that no photographs of Lauver's injuries to his face or arm were admitted into evidence. The state introduced six close-up photographs of Dupree's body during its direct examination of Dr. Carlos Santoscoy, the pathologist who performed Dupree's autopsy at the Cuyahoga County Coroner's Office.

**{¶ 88}** Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. *State v. Landrum*, 53 Ohio St.3d at 121, 559 N.E.2d at 726; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. Close-up photographs of victims' injuries, even if gruesome, are admissible in capital cases if the probative value of the photographs outweighs the danger of material prejudice and if the photographs are not repetitive or cumulative in number. *Id.*

**{¶ 89}** In *State v. Morales* (1987), 32 Ohio St.3d 252, 513 N.E.2d 267, this court determined that numerous gruesome photographs depicting the scene of a murder and the body of the victim both before and during the coroner's examination were neither repetitive nor cumulative and that the probative value of the photographs outweighed the danger of unfair prejudice to the defendant. *Id.* at 258,

34

513 N.E.2d at 273-274. In *Landrum, supra,* we reached the same conclusion regarding a close-up photo depicting the murder victim's slit throat. *State v. Landrum*, 53 Ohio St.3d at 121, 559 N.E.2d at 726.

{¶ 90} We have reviewed the six photographs of Dupree's body that the state introduced into evidence. The photographs illustrated the coroner's testimony and were relevant to significant trial issues such as the cause of Dupree's death, the distance of Treesh's gun from Dupree's body when it discharged, and the lack of defensive wounds on Dupree's body. Dupree's wounds had been cleaned before the photographs were taken, and the photographs do not appear gruesome or repetitive. Even if Exhibits 32(b), (c), and (d)—the three photographs depicting the cleaned bullet holes in Dupree's body—could be described as gruesome, the probative value of these photographs substantially outweighed any danger of unfair prejudice to Treesh. Accordingly, we overrule Treesh's twelfth proposition of law.

L. Sufficiency of the Evidence

{¶ 91} In his tenth and sixteenth propositions of law, Treesh argues that the evidence presented at trial was legally insufficient to support his convictions for aggravated murder and attempted aggravated murder. The relevant question in determining the sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis deleted.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. We will not disturb the verdict unless we find that reasonable minds could not reach the conclusion reached by the trier of fact. *Id.* at 273, 574 N.E.2d at 503.

1. Aggravated Murder of Dupree

{¶ 92} Treesh insists that the state failed to introduce sufficient evidence to support his conviction for aggravated murder. Treesh devotes much of his sixteenth

proposition to his contention that the state failed to show that he murdered Dupree with "prior calculation and design" as R.C. 2903.01(A) requires. But Treesh was indicted for and convicted of "purposely caus[ing] the death of Henry Dupree while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit Aggravated Robbery or Robbery" in violation of R.C. 2903.01(B), and was convicted on a death-penalty specification under R.C. 2929.04(A)(7) that he was the principal offender, not that he acted with prior calculation and design. For this reason, the element of prior calculation and design is not at issue.

{¶ 93} Under R.C. 2903.01(B), the state was required to prove that Treesh "purposely caus[ed] the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery or robbery * * *." A person acts purposely when he or she specifically intends to cause a certain result. R.C. 2901.22(A). Because the intent of an accused dwells in his or her mind and can never be proved by the direct testimony of a third person, it must be gathered from the surrounding facts and circumstances, and the General Assembly has provided that intent to kill may be proven by inference. Former R.C. 2903.01(D), 139 Ohio Laws, Part I, 3-4. See, also, *In re Washington* (1998), 81 Ohio St.3d 337, 340, 691 N.E.2d 285, 287. "[S]uch an intent may be inferred in a felony-murder when the offense and the manner of its commission would be likely to produce death." *State v. Garner*, 74 Ohio St.3d at 60, 656 N.E.2d at 634.

{¶ 94} Like the court of appeals, we find sufficient, credible evidence in the record to support the jury's determination that Treesh purposely caused the death of Henry Dupree. Treesh and Brooks planned the armed robbery in advance and entered the Vine Street News with fully loaded, particularly lethal weapons—a sawed-off shotgun and a nine-millimeter handgun containing Hydra-Shok bullets. Even though the store clerk in the front of the store cooperated with Treesh and his

accomplice, Treesh sought out Dupree in a separate area at the rear of the store. Treesh found Dupree sitting in a chair watching television, unaware of Treesh's presence in the rear of the store and unaware that a robbery was even occurring. Instead of simply turning around and returning to the front of the store to continue the robbery or flee, Treesh poked Dupree with his gun, ordered him to stand up, and shot him multiple times at close range.

{¶ 95} Treesh claims that he merely attempted to disarm Dupree and that his gun discharged during a fierce hand-to-hand struggle—a contention that Treesh never mentioned to the police during his lengthy stationhouse interrogation. But Plunkard, the witness who hid in a viewing booth at the rear of the store, heard no signs of a struggle prior to the gunshots. Plunkard testified that the shots sounded in a steady rhythm. The record also contains physical evidence and substantial, credible expert testimony to discount Treesh's contention that he shot Dupree during a struggle. Dupree's body lacked defensive wounds suggestive of a struggle. And despite Dupree's considerable loss of blood, a forensic serologist found no traces of blood identifiable as Dupree's on Treesh's jeans, shirt, or shoes. The lack of any significant smearing of blood spatters in the area of the alleged struggle also cast doubt on appellant's theory. Circumstantial evidence and direct evidence inherently possess the same probative value. *Jenks, supra,* 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. Dupree suffered two close-range shots in his chest, and we have repeatedly held that multiple close-range gunshots to a vital area tend to demonstrate a purpose to kill. See *State v. Palmer* (1997), 80 Ohio St.3d 543, 562, 687 N.E.2d 685, 702; *State v. Otte* (1996), 74 Ohio St.3d 555, 564, 660 N.E.2d 711, 720.

2. Attempted Aggravated Murders of Lauver and Stih

{¶ 96} Treesh also argues that the evidence was legally insufficient for the jury to conclude that Treesh attempted to commit the aggravated murders of Lauver and Sergeant Stih. R.C. 2923.02(A); 2903.01(B). We disagree. Treesh claims that

he never intended to shoot Lauver, but aimed instead at the telephone behind Lauver. The physical evidence at trial, however, as well as Lauver's own testimony, reveals that even though Lauver cooperated with Treesh and his accomplice, Treesh raised his weapon and fired multiple shots at Lauver's face from close range as he left the store. At least one bullet struck Lauver in the face, and the presence of a spent, fully mushroomed bullet in the floor nearby provided credible evidence that Lauver was struck a second time by a bullet that passed through his body. Even if only one bullet struck Lauver, we reject Treesh's unsupported contention that "one shot at a person is not indicative of intent to murder."

{¶ 97} The record also contains sufficient evidence to show that during his attempt to flee, Treesh fired his weapon through the rear window of the car at Sergeant Stih's pursuing cruiser, assumed an "action stance" when he got out of the car, and continued firing at Stih until his gun was empty. Stih testified that he lay across the front seat of his cruiser and backed away to avoid being hit, and that he later found a nine-millimeter hole in his cruiser's light bar. Detective Ernie Iafelice, a Euclid officer who assisted in the recovery of evidence at the intersection where Treesh fired on Stih, noticed ricochet marks on Stih's vehicle.

{¶ 98} Based on the total number of bullets fired and recovered from the Vine Street News and the area where police apprehended Treesh, the state's evidence suggests that Treesh must have reloaded his weapon at some point while attempting to flee, indicating that he was "not content to use it merely as a prop" to ward off pursuit. *State v. Dennis* (1997), 79 Ohio St.3d 421, 439, 683 N.E.2d 1096, 1111. Treesh also admitted telling the arresting officers immediately after his arrest that he wished he had killed them. Viewed in a light most favorable to the prosecution, the evidence is sufficient to support Treesh's convictions for attempted aggravated murder.

III. Penalty Phase: Victim's Family's Request for Death Penalty

{¶ 99} In his seventeenth proposition of law, Treesh contends that the trial court committed prejudicial error when it allowed the jury to hear certain victim-impact testimony during the mitigation phase. Though we agree with appellant that the trial court should not have heard testimony from Dupree's daughter recommending that the trial court impose the death penalty, we do not agree that this error necessitates reversal.

{¶ 100} In 1987, the United States Supreme Court held that "the introduction of a [victim-impact statement] at the sentencing phase of a capital murder trial violates the Eighth Amendment." *Booth v. Maryland* (1987), 482 U.S. 496, 509, 107 S.Ct. 2529, 2536, 96 L.Ed.2d 440, 452. In *Booth*, the court concluded that such information "is irrelevant to a capital sentencing decision, and * * * its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Id.* at 502-503, 107 S.Ct. at 2533, 96 L.Ed.2d at 448. The victim-impact testimony at issue in *Booth* concerned descriptions of the victims, the emotional impact of the crimes on the family, and "the family members' opinions and characterizations of the crimes and the defendant." *Id.* at 502, 107 S.Ct. at 2533, 96 L.Ed.2d at 448. Three years after *Booth*, this court held that "[e]xpressions of opinion by a witness as to the appropriateness of a particular sentence in a capital case violate the defendant's constitutional right to have the sentencing decision made by the jury and judge." *State v. Huertas* (1990), 51 Ohio St.3d 22, 553 N.E.2d 1058, syllabus.

{¶ 101} The following year, the United States Supreme Court overruled its decision in *Booth*, holding that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Payne v. Tennessee* (1991), 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736. The *Payne* court explicitly cautioned, however, that "*Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, *and the appropriate*

*sentence* violates the Eighth Amendment. No evidence of the latter sort was presented at the trial in this case." (Emphasis added.) *Id.* at 830, 111 S.Ct. at 2611, 115 L.Ed.2d at 739, fn. 2. Because *Payne* did not reexamine the constitutionality of victims' recommendations as to the appropriate sentence, we have continued to adhere to our *Huertas* syllabus and have prohibited the admission of witnesses' opinions as to the appropriateness of a particular sentence. See, *e.g.*, *State v. Goodwin* (1999), 84 Ohio St.3d 331, 343, 703 N.E.2d 1251, 1262; *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 438-439, 650 N.E.2d 878, 882. Other victim-impact testimony, such as testimony depicting the circumstances surrounding the offense and the impact of the murder on the victim's family, "may be admissible during *both* the guilt and the sentencing phases." (Emphasis *sic*.) *Id.* at 440, 650 N.E.2d at 883.

{¶ 102} Though our decisions in *Goodwin* and *Fautenberry* underscored the impropriety of victim-impact testimony containing sentencing recommendations, those decisions also illustrate that the admission of such testimony does not necessarily result in reversible error. In *Goodwin*, after the jury's sentencing verdict, the trial judge permitted the prosecutor to present victim-impact testimony from the victim's brother. Through the prosecutor, the brother said that he agreed with the jury's verdict and "would ask this Court to follow the recommendation * * * [and impose] the death penalty." *Id.*, 84 Ohio St.3d at 343, 703 N.E.2d at 1262. We acknowledged the impropriety of this testimony but unanimously upheld the appellant's death sentence, concluding that "[the victim's brother's] brief opinion, expressed by the prosecutor without emotion, elicited no objection. No plain error is present. * * * Presumably, the trial judge remained uninfluenced, since his sentencing decision never referred to the brother's opinion. * * * Moreover, any error is readily cured by this court's independent sentence review." *Id.*, 84 Ohio St.3d at 343, 703 N.E.2d at 1262.

{¶ 103} In *Fautenberry, supra,* we arrived at a similar conclusion. The victim-impact statement reviewed by the three-judge panel indicated that each victim interviewed wanted the appellant to receive "the maximum sentence" available under the law. *Id.*, 72 Ohio St.3d at 437, 650 N.E.2d at 881. We were not persuaded that this error necessitated reversal, because "[a] review of the three-judge panel's decision * * * fail[ed] to demonstrate that the judges contemplated or relied upon the victim-impact evidence which was available to them. 'Absent an indication that the panel was influenced by or considered the victim impact evidence in arriving at its sentencing decision,' the admission of such is not reversible error." *Id.* at 439, 650 N.E.2d at 882, quoting *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759.

{¶ 104} In the case at bar, the trial court reviewed the victim-impact statements of Sergeant Stih and Louis Lauver, and then permitted Henry Dupree's daughter, Linda Luckason, to be heard. After telling the court how much her family would miss Dupree, Luckason said: "We strongly support an 'Eye for an Eye.' * * * We are asking that the death penalty be given to Mr. Treesh, which is what he gave to my father, Henry. Judge, we hope you exercise your decision [*sic*] in this case to the full extent of the law by ordering the death penalty for Mr. Treesh as his punishment for this horrendous crime and lack of regard for human life. He felt nothing during his killing spree, and at this time we feel nothing for him." Defense counsel objected and asked the court to disregard Luckason's statement. The trial court noted the objection, but referred to statutory authorization for the consideration of victim-impact statements. We agree with Treesh that defense counsel properly objected to Luckason's statement, because it contained an express recommendation that Treesh receive the death penalty. See *Huertas, Goodwin,* and *Fautenberry, supra.* Nonetheless, we conclude that this error does not necessitate reversal.

**{¶ 105}** In his proposition, Treesh contends that the objectionable victim-impact testimony was heard by the jury. But Luckason's improper sentencing recommendation occurred before the judge, after the jury had made its sentencing recommendation and had been excused. Moreover, as the court of appeals noted, we presume that the trial judge considers only relevant, competent evidence in arriving at his or her judgment. *Post, supra,* 32 Ohio St.3d at 384, 513 N.E.2d at 759. Though Luckason's emotional plea for the death penalty was heard directly by the court—in contrast to the prosecutor's second-hand recital of the brother's recommendation in *Goodwin*—there is no indication here that the trial court relied on Luckason's recommendation. See *State v. Allard* (1996), 75 Ohio St.3d 482, 491, 663 N.E.2d 1277, 1286. On the contrary, when ruling on a pretrial motion to exclude victim-impact testimony, the trial judge prohibited the state from presenting "evidence concerning the victims as nonstatutory aggravating circumstances during the penalty phase," indicating that the court was aware of the limitations on victim-impact evidence. And the court did not refer to Luckason's improper sentencing recommendation either orally at sentencing or in the court's written sentencing opinion. For the foregoing reasons, appellant's seventeenth proposition of law lacks merit.

IV. Ineffective Assistance of Counsel

**{¶ 106}** In his fifteenth proposition of law, Treesh argues that he received ineffective assistance from trial counsel at several times throughout the trial. Reversal of a conviction on the grounds of ineffective assistance of counsel requires a showing, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have

been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶ 107} Treesh first contends that his counsel should not have waived his right to be present at two pretrial conferences because the trial court had previously granted Treesh's motion to be present at all proceedings. But when the trial court granted Treesh's motion, it specifically stated: "The court will accept the assurances of defendant's attorney whether the defendant wishes to be present at pre-trial conferences. Defendant's attorney has already stated that it is not the defendant's desire to be present at pre-trial conferences and that defendant has waived his presence." Accordingly, counsel's waiver of Treesh's presence at two pretrial conferences was consistent both with Treesh's own wishes and the court's journal entry. Even if Treesh now contends that he should have been present at the pretrials, he fails to demonstrate how his attorney's waiver of his presence in any way prejudiced him.

{¶ 108} Next, Treesh contends that his counsel wrongly chose not to order a presentence investigation and psychological report under R.C. 2929.03(D)(1). "The decision to request a pre-sentence report is one of sound trial strategy. Such trial strategy should not be second-guessed by reviewing courts in a claim of ineffective assistance of counsel." (Citations omitted.) *State v. Williams* (1991), 74 Ohio App.3d 686, 697, 600 N.E.2d 298, 305. Regardless, Treesh again fails to demonstrate how the failure to order the reports prejudiced him.

{¶ 109} Third, Treesh argues that his attorney should have called Mark Angellota—his court-appointed investigator—as well as Angelotta's wife, Terri, as defense witnesses. Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court. *Id.* at 695, 600 N.E.2d at 304. Further, Treesh fails to explain how counsel's failure to call these two witnesses prejudiced him.

{¶ 110} Fourth, Treesh contends that his counsel were ineffective for failing to challenge two jurors, Cynthia Barth and Barbara Modica, during voir dire. Treesh argues that counsel should have challenged Barth because she had taken paralegal classes taught by the prosecutor, Charles Coulson. Treesh claims that counsel should have challenged juror Modica due to her media exposure about the case and her alleged predisposition in favor of the death penalty. We find both contentions meritless. It is unlikely that a challenge for cause, if made, would have succeeded in either case. Barth testified that her past affiliation with Coulson's paralegal course would not impair her ability to render a fair and impartial verdict. Likewise, though Modica admitted exposure to some newspaper articles about the case, and admitted that she favored the death penalty "[w]hen it's warranted," she stated that she had not formed an opinion about the case and that she could fairly and impartially weigh the evidence presented.

{¶ 111} Treesh's fifth contention, that counsel were ineffective for withdrawing the show-up identification portion of Treesh's motion to suppress, is also meritless. Identity was never an issue in this case, because appellant admitted both his participation in the robbery and his presence during the fatal encounter with Dupree at the rear of the store. Defense counsel's decision to withdraw the show-up identification issue was consistent with the defense, and Treesh has failed to demonstrate how it prejudiced him.

V. Proportionality Review

{¶ 112} In his twentieth proposition of law, Treesh asks this court to revisit the issue concerning the universe of cases to be considered by an appellate court when conducting the proportionality review required by R.C. 2929.05(A). Treesh presents no new arguments relating to this issue, which we overrule on the authority of *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus; see, also, *State v. Baston* (1999), 85 Ohio St.3d 418, 429, 709 N.E.2d 128, 137-138.

VI. Independent Sentence Review

{¶ 113} In his nineteenth proposition of law, Treesh argues that the state failed to establish beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors and that the imposition of the death penalty in this case was both inappropriate and disproportionate. We resolve these issues pursuant to our statutorily mandated independent review. R.C. 2929.05(A).

{¶ 114} We are obligated to independently weigh the aggravating circumstances against the mitigating factors and to determine whether appellant's sentence is disproportionate to sentences in similar cases. *Id.* We begin by considering whether the evidence supports a finding of the aggravating circumstance that the state elected to pursue in this case, specifically, that Treesh committed the aggravated murder of Dupree while committing, attempting to commit, or fleeing immediately after committing or attempting to commit the offense of aggravated robbery, and that Treesh was the principal offender in the commission of the aggravated murder. R.C. 2929.04(A)(7). We find that the evidence proves beyond a reasonable doubt the aggravating circumstance charged against Treesh. The evidence of record demonstrates that Treesh, as the principal offender, purposely killed Dupree while committing, attempting to commit, or fleeing the aggravated robbery of the Vine Street News.

{¶ 115} Against this aggravating circumstance, we weigh the nature and circumstances of the offense, the history, character, and background of the offender, and any applicable factors enumerated in R.C. 2929.04(B)(1) through (7). The nature and circumstances of the offense offer no mitigating value. After participating in a cocaine binge, Treesh and his companions planned the armed robbery to satisfy their desire for additional cocaine. Treesh entered the Vine Street News with a fully loaded handgun containing Hydra-Shok bullets, sought out a security guard in the rear of the store who was unaware a robbery was in progress,

shot the guard twice in the chest at close range, shot the unarmed and cooperative store clerk in the face as he fled, and fired multiple shots at pursuing police officers.

{¶ 116} The defense's mitigation witnesses testified at length about Treesh's family history, character, and background. Appellant's mother, who was two years old when her own mother died, was sexually abused by her father and grandfather and lived for a time at a state mental hospital. Mrs. Treesh testified that appellant always had difficulty in school and that Treesh's father "didn't go to ball games, he didn't share things with Frederick that Frederick needed." Treesh's parents divorced when he was four, but eventually remarried. Treesh's older sister testified that she loved appellant, but that as a young boy, Treesh was a "daredevil" who would "try anything once."

{¶ 117} Treesh's mother enrolled him in Big Brothers/Big Sisters, but pulled him from the program after hearing rumors that Treesh's assigned Big Brother was a homosexual. By the time Treesh was in junior high school, his behavior had deteriorated to the point where he vandalized property, engaged in petty theft, and regularly skipped classes. After fathering a child at the age of seventeen, Treesh eventually found employment as a heavy equipment operator, but suffered a concussion due to a workplace accident and became severely depressed.

{¶ 118} The defense also presented the testimony of a psychologist, Dr. Sandra McPherson. McPherson testified that Treesh suffered from a "classic" case of attention deficit/hyperactivity syndrome ("ADHD"), depression, and cocaine addiction. According to McPherson, persons with ADHD have difficulty sitting still, completing their work, or remembering things; they may lack some social skills and suffer from low self-esteem. McPherson testified that children with ADHD often receive negative feedback from teachers, and that there is a high correlation between ADHD and drug use. McPherson testified that Treesh had a fourth-grade spelling ability, could read at a seventh-grade level, and could do

mathematics at a sixth-grade level. Despite Treesh's poor achievement in school, McPherson testified that he tested in the normal range on IQ tests.

{¶ 119} On cross-examination, McPherson conceded that she could not form an opinion as to whether the conditions she diagnosed necessarily impaired Treesh's capacity to appreciate the criminality of his conduct. Because McPherson stopped short of showing that Treesh's ADHD caused him to lack the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, we do not consider her testimony to support a finding of the R.C. 2929.04(B)(3) mitigating circumstance (mental disease or defect). See *State v. Fox* (1994), 69 Ohio St.3d 183, 187, 631 N.E.2d 124, 128. Though we consider her testimony under the R.C. 2929.04(B)(7) residual category, we assign it relatively little weight. *Id.*

{¶ 120} Under the R.C. 2929.04(B)(7) residual category, the defense presented other factors in mitigation. Treesh's father testified that he would miss appellant if Treesh was put to death. The mother of appellant's child testified that appellant regularly kept in touch with his daughter during the proceedings, and that she did not want appellant to be executed. Appellant's twelve-year-old daughter testified that she had spent but one Christmas with appellant over the course of her life, and that she did not wish her father to be put to death. Finally, Treesh made an unsworn statement in which he apologized to the Dupree family and acknowledged that what he did was wrong.

{¶ 121} We find the statutory mitigating factors in R.C. 2929.04(B)(1) (inducement by the victim), (B)(2) (duress, coercion, or provocation), (B)(4) (youth of the offender), (B)(5) (lack of criminal record), and (B)(6) (accused not the principal offender) inapplicable to this case. And though the trial court instructed the jury that residual doubt was a permissible R.C. 2929.04(B)(7) factor, this court has since ruled that residual doubt is not an acceptable mitigating factor under the statute because it is irrelevant to the issue of whether the defendant should be

sentenced to death. *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus. Because *McGuire* applies retroactively, see *State v. Webb* (1994), 70 Ohio St.3d 325, 330-331, 638 N.E.2d 1023, 1029-1030, we need not consider residual doubt in our independent review. *State v. Bey* (1999), 85 Ohio St.3d 487, 509, 709 N.E.2d 484, 503.

{¶ 122} We assign some weight in mitigation to Treesh's history, character, and background, see *State v. Spivey* (1998), 81 Ohio St.3d 405, 424, 692 N.E.2d 151, 166, as well as to his cocaine addiction, see *State v. Landrum*, 53 Ohio St.3d at 125, 559 N.E.2d at 730. Treesh's remorse is also worthy of some weight. *Id.* We accord modest weight to Treesh's prior employment, see *State v. Madrigal* (2000), 87 Ohio St.3d 378, 400, 721 N.E.2d 52, 72, and the love and support of his family. See *State v. Smith* (2000), 87 Ohio St.3d 424, 447, 721 N.E.2d 93, 116. Overall, however, we consider the mitigating factors to be of minimal significance here and conclude that they are substantially outweighed by the aggravating circumstance.

{¶ 123} We also conclude that the penalty imposed in this case is neither excessive nor disproportionate when compared with factually similar capital cases involving comparable or even more compelling mitigating factors. See, *e.g.*, *State v. Martin* (1985), 19 Ohio St.3d 122, 19 OBR 330, 483 N.E.2d 1157 (appellant shot drug store owner during aggravated robbery; parental problems, difficulty in school, lack of support from father); *State v. Byrd* (1987), 32 Ohio St.3d 79, 512 N.E.2d 611 (young offender stabbed clerk during aggravated robbery of convenience store; difficult upbringing, learning disability, remorse, drug use); *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180 (aggravated robbery of bar; alcoholic father, low intelligence, chronic underachiever, supportive family, daily cocaine use); *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965 (aggravated robbery of convenience store; young offender, difficult upbringing,

cocaine addiction).  The mitigating factors present in this case do not distinguish Treesh's death sentence as excessive or disproportionate.

{¶ 124} For the foregoing reasons, we affirm Treesh's convictions and death sentence.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

RESNICK, J., concurs in judgment only.

_____

APPENDIX

{¶ 125} *Proposition of Law No. 1:* A defendant is entitled to a change of venue, pursuant to Rule 18 of the Ohio Rules of Criminal Procedure and applicable law, when the incident in question is highly publicized locally and nationally.

{¶ 126} *Proposition of Law No. 2:* A defendant is entitled to the suppression of statements made by him to law enforcement officers and subsequent evidence obtained from the defendant when such were collected in violation of his rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 14 of the Ohio Constitution.

{¶ 127} *Proposition of Law No. 3:* A trial court must dismiss an indictment when evidence establishes that critical evidence is missing and/or intentionally destroyed by or in the possession [*sic*] the State of Ohio.

{¶ 128} *Proposition of Law No. 4:* A defendant in a capital punishment criminal matter is entitled to require the State of Ohio to produce the record of the grand jury proceedings.

{¶ 129} *Proposition of Law No. 5:* A defendant in a death penalty criminal case is entitled by law to have daily transcripts of any and all proceedings provided to him.

{¶ 130} *Proposition of Law No. 6:* A defendant in a death penalty criminal case is entitled to an increase in the number of peremptory juror challenges.

{¶ 131} *Proposition of Law No. 7:* A prosecutor's conduct during voir dire in violation of a defendant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United State [*sic*] Constitution and Sections 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 132} *Proposition of Law No. 8:* The inclusion of juror Lynn Volke denied appellant his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution, which guarantee an accused a fair trial and an impartial jury.

{¶ 133} *Proposition of Law No. 9:* A trial court commits prejudicial error by allowing the state of Ohio to argue in an improper and inflammatory manner during the guilt phase before the jury, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 134} *Proposition of Law No. 10:* A trial court commits prejudicial error by overruling the motions for acquittal made by a defendant, in violation of the defendant's rights as guaranteed him by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 9 and 10, Article I of the Ohio Constitution.

{¶ 135} *Proposition of Law No. 11:* A defendant is denied his right to a fair trial and due process by a trial court's denial of his motion for mistrial in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 5, 9, 10, and 16, Article I of the Ohio Constitution.

{¶ 136} *Proposition of Law No. 12:* A defendant is denied his Sixth, Eighth and Fourteenth Amendment rights as guaranteed by the United States Constitution and Sections 9 and 10, Article I of the Ohio Constitution to a fair trial, due process and a reliable determination of his guilt and sentence when gruesome, prejudicial and cumulative photographs were admitted into evidence even though their prejudicial effect outweighed their probative value.

{¶ 137} *Proposition of Law No. 13:* A trial court errs to the prejudice of a defendant when it denies a motion for mistrial after the prosecution referred to the defendant's prior acts.

{¶ 138} *Proposition of Law No. 14:* A trial court commits prejudicial error by allowing a prosecutor to argue in an improper and inflammatory manner during the first portion of the State of Ohio's summation in the guilt phase before the jury, in violation of the defendant's Fifth, Sixth, Eighth and Fourteenth Amendments to

the United States Constitution and Sections 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 139} *Proposition of Law No. 15:* Ineffective assistance of counsel provided to a defendant violate [*sic*] his rights to a fair and impartial jury trial and sentence, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 5, 9, 10 and 16 of the Ohio Constitution.

{¶ 140} *Proposition of Law No. 16:* A jury and trial court err to the prejudice of a defendant when there is insufficient evidence for the trier of fact to find him guilty of aggravated murder and/or attempted aggravated murder beyond a reasonable doubt.

{¶ 141} *Proposition of Law No. 17:* A trial court commits prejudicial error by allowing victim impact testimony to be heard by the jury during the mitigation phase of a death penalty case, over the objection of the defendant, in violation of the defendant's rights as guaranteed to him by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 5, 9 and 10, Article I of the Ohio Constitution.

{¶ 142} *Proposition of Law No. 18:* A trial court errs to the prejudice of a defendant when it fails to allow a defense witness to testify during the mitigation phase of the trial relating to the gravity of the threat the defendant would pose to the community if he were allowed to live and to be incarcerated as opposed to being put to death.

{¶ 143} *Proposition of Law No. 19:* The trial court erred to the prejudice of the Appellant when it rules [*sic*] that any and all aggravating circumstances presented concerning the aggravated murder of Mr. Dupree outweighed the mitigating factors presented during the penalty phase of the trial.

{¶ 144} *Proposition of Law No. 20:* A trial court errs in imposing the death sentence on a defendant. The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio

Constitution establish the requirements for a valid death penalty scheme. Ohio's statutory provisions governing the imposition of the death penalty, contained in Ohio Revised Code Sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05, do not meet the prescribed requirements and thus are unconstitutional, both on their face and as applied to the Appellant.

{¶ 145} *Proposition of Law No. 21:* The trial court erred to the prejudice of the Appellant by failing to declare Ohio Revised Code Section 2929.04(A)(7) unconstitutional as it applied to Count One, aggravated murder as indicted, pursuant to Ohio Revised Code Section 2903.01(B) and thereby, dismissing Specification II of Count One.

————————————

*Thomas G. Lobe* and *John P. Keshock*, for appellant.

————————————