This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant Anthony Maple ("Maple") appeals his convictions in the Summit County Court of Common Pleas for attempted aggravated murder, aggravated burglary, and aggravated robbery with a firearm specification. We affirm.
 I.
Gary Morris ("Morris") is a cement mason. On the morning of June 11, 2000, a man came to Morris' home in Norton, Ohio, asking Morris to give him a quote for some cement work. While Morris went into another room to gather paper and a pencil, the man headed toward his vehicle parked in Morris' driveway. When Morris retrieved the paper and turned to go to his door, he saw the man coming back in the front door carrying a gun.
The man yelled back toward his car where a second man was waiting and made Morris sit on the floor. As the second man entered the home, Morris was instructed to lay on his stomach and put his hands behind his back. Morris struggled as the second man tried to tie his arms and the first man shot him. The first man told the second to search through the house, then proceeded to shoot Morris two more times. Morris was shot in the abdomen, the ankle, and the penis. The men took $400 from Morris' house. They also took a .380 handgun Morris kept in his bedroom.
The investigation led the police to Maple. On December 8, 2000, Maple was indicted on one count of attempted aggravated murder, in violation of R.C. 2903.01(B) and R.C. 2923.02; one count of aggravated robbery, in violation of R.C. 2911.01(A)(1); and one count of aggravated burglary, in violation of R.C. 2911.11(A)(1). Maple entered a plea of not guilty. On January 26, 2001, a supplemental indictment was filed, adding a firearm specification to the aggravated robbery charge, pursuant to R.C. 2923.11. Maple entered a plea of not guilty to this charge. The matter proceeded to jury trial on March 1 and 2, 2001.
The jury found Maple guilty as charged. The trial court sentenced him to ten years imprisonment for attempted aggravated murder and ten years for aggravated robbery, with three additional years on the firearm specification. The court ordered Maple to serve these two sentences concurrently. The court also sentenced Maple to seven years for aggravated burglary, with this sentence to be served consecutively with the other sentences.
Maple timely appealed, asserting five assignments of error. We address the assignments of error out of order for ease of discussion.
 II.
Assignment of Error No. 4
 THE COURT IMPROPERLY OVERRULED DEFENDANT'S MOTION FOR ACQUITTAL.
In his fourth assignment of error, Maple asserts that there was insufficient evidence to sustain his convictions and that the trial court erred in overruling his Crim.R. 29 motion. Even though this assignment of error does not directly state an argument that the convictions are also against the manifest weight of the evidence, Maple addresses this issue in his argument. We will discuss each in turn.
As a preliminary matter, we note that sufficiency of the evidence and manifest weight of the evidence are distinct legal concepts. State v.Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. When considering a challenge to the sufficiency of the evidence, the court must determine whether the prosecution has met its burden of production, while a manifest weight challenge requires the court to examine whether the prosecution has met its burden of persuasion. Id. at 390 (Cook, J., concurring).
Maple first argues his convictions are not supported by sufficient evidence. After a careful review of the record, we find that Maple waived any objection under Crim.R. 29 to the sufficiency of the evidence.
In order to preserve the denial of a Crim.R. 29(A) motion for appellate review, a defendant who is tried before a jury and brings such a motion at the close of the state's case must renew the motion for acquittal at the close of all evidence, provided that the defendant puts on a defense. State v. Miley (1996), 114 Ohio App.3d 738, 742. Furthermore, a defendant may not challenge the sufficiency of the evidence on appeal unless he moves for judgment of acquittal after the jury returns a guilty verdict. State v. Liggins (Aug. 18, 1999), Summit App. No. 19362, unreported, at 3.
In this case, Maple failed to renew his Crim.R. 29 motion for acquittal after presenting his defense. He also failed to move for judgment of acquittal after the jury returned their guilty verdicts. As such, Maple waived any objection under Crim.R. 29 to the sufficiency of the evidence and we will not consider this assignment of error.
Maple next asserts that his convictions are against the manifest weight of the evidence. We disagree.
A review of the weight of the evidence determines whether the state has met its burden of persuasion. State v. Angle (June 2, 1999), Medina App. No. 2875-M, unreported, at 7. When a defendant asserts that the conviction is against the manifest weight of the evidence,
 [a]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
State v. Otten (1986), 33 Ohio App.3d 339, 340. Only in the exceptional case, where the evidence presented weighs heavily in favor of the defendant, will the appellate court reverse and order a new trial. Id.
Maple was charged with attempted aggravated murder. The attempt statute states that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A). To constitute aggravated murder under 2903.01(B), the defendant must "purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery or robbery, aggravated burglary or burglary[.]" R.C. 2903.01(B).
Maple was also charged with aggravated burglary under R.C. 2911.11(A)(1), which states: "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * *, when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if * * * the offender inflicts, or attempts or threatens to inflict physical harm on another." R.C.2911.11(A)(1).
Finally, Maple was charged with aggravated robbery, with a firearm specification, under R.C. 2911.01(A)(1), which states:
 [n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]
R.C. 2911.01(A)(1).
The prosecution called the victim, Morris, to testify. Morris testified that he saw the man who shot him and described him as being a black man, "strange looking, wild looking. It was like his hair was on top of his head, looked like he had small breasts." Morris also testified that the man had a gold tooth and drove a burgundy car that resembled a Chrysler. Morris stated that he was "fairly sure" the defendant was the man and that he would know for sure if he heard him speak. Morris did not see the second man, the one who ransacked his home. Morris also testified that the composite made from his description of the man who shot him was "not very good" and that he felt "it just didn't match up." Morris described the gun as a nickel-plated .38 with a six-inch barrel.
On cross-examination, Morris admitted that immediately after he was shot he could not describe the gun used to injure him, nor did he ever describe the suspect as having pockmarks on his face. Morris admitted that Maple has pockmarks on his face. Morris explained that his memory was clearer after some time, and that immediately after he was shot he felt like he was in a dream.
Dr. John Trupiano testified that Morris' injuries were life threatening. Dr. Trupiano testified that the doctors repaired a hole in Morris' left colon, stopped bleeding from the inferior tip of his liver, and repaired a hole in his proximal small bowel. They also inserted a tube in Morris' stomach to drain the gastric juice and a feeding tube. Dr. Trupiano believed that without appropriate medical care, Morris' wounds would have been lethal.
Special Agent Charles Snyder, Jr. of the Ohio Bureau of Criminal Identification Investigation testified next for the state. Agent Snyder testified that he performs the initial evidence gathering from a possible crime scene. As he arrived at Morris' house, he observed a weapon that had been tagged by the Norton Police lying in the driveway. This weapon was later identified as the one taken from Morris' bedroom. Agent Snyder also testified that he collected evidence on the scene, such as a bloody piece of rope, a piece of an eyeglass frame, a base of a telephone that had been pulled from the wall, and a bullet that had lodged under the carpeting. He further testified that cushions, furniture, and dresser drawers were strewn throughout the house, making it appear that the house had been ransacked. He also recovered some fingerprints from the front door but could not testify as to what the results of fingerprint analysis were.
On cross-examination, Agent Snyder identified the composite sketch he prepared based upon Morris's description. He further testified that Morris rated the composite as being 60% accurate. He also explained that the purpose of a composite sketch is not "for the purpose of arrest or anything. It's just to aid you with a possible likeness."
David Bushner ("Bushner") testified for the state. Bushner said that Maple is his "best friend" and has been since they were in seventh grade together. Bushner admitted he was the man who ransacked Morris' house. He was convicted for attempted murder, burglary, having a weapon under disability, and a gun specification in connection with the incidents at the Morris home on June 11, 2000. Bushner admitted that because he was testifying against Maple, the prosecutor promised to ask the judge to consider Bushner's testimony during his sentencing.
Bushner testified that Belinda Brophy ("Brophy"), who at one time had been Morris' live-in girlfriend, contacted Bushner regarding stealing $60,000 to $90,000 in cash that Morris kept in his home. Bushner thought that the job would require an additional person, so he took the idea to Maple. A few days before the robbery and shooting, Bushner and Maple met with Brophy to go over the details. Learning details of Morris' schedule and the likely location of the money from Brophy, Maple and Bushner decided on what clothes they would wear, what time they would go to Morris' home, and determined that Morris would need to be restrained while one of them searched the house.
Bushner testified that he and Maple obtained a .38 revolver the day before the robbery. They borrowed a burgundy car from Bushner's uncle. When asked to describe Maple's appearance on the day of the robbery, Bushner testified: "He was wearing a wig. He had some kind of makeup on his face, very, very little. * * * He had some stuff up under his jacket where it made it look like he had big — a big chest." He also explained that Maple was clean shaven and wore his gold tooth.
Bushner testified to the details of the robbery and the circumstances under which Maple shot Morris. He identified the rope as the one Maple gave him to tie Morris up and identified the piece of an eyeglass frame found at Morris' house as belonging to a pair of Bushner's sunglasses. He stated that Morris reached back as they struggled with the rope and broke that section off of the sunglasses. Bushner stated that he searched the basement and bedroom for the money, only to find about $200 in a money clip and a gun case under the bed. He stated that when Maple shot Morris the final time, Morris was helplessly lying on the floor and "wasn't a threat to [them] anymore." As they left Morris' home Maple wiped down the doorway with a rag. Bushner dropped the gun case in the driveway on the way out.
Bushner stated that he and Maple stopped at a gas station, where Bushner called 911. Bushner testified that he felt Morris would not make it if he did not call for help. Bushner and Maple then split up the cash, throwing the money clip into nearby woods. They later changed vehicles and disposed of the wig and clothes into a dumpster. They disposed of the gun in Summit Lake. Bushner testified that he was not sure what happened to the telephone Maple had pulled out of the wall at Morris' home. It was either disposed of in the dumpster or at Summit Lake.
Bushner testified that when he met with Maple a few days later, Maple's leg was injured and he was limping. He further stated that Maple had no such injury on the day of the robbery and shooting.
On cross-examination, Bushner admitted that he had given four different versions of the events. First, he told detectives that he found Morris shot when he went to pick up some money that Morris' girlfriend owed him. He told another version at his own trial, saying that he left Maple out of that version to help a friend.
The defense presented a letter Bushner wrote while he was in jail to Rita Livingston ("Livingston"), Maple's girlfriend. The letter read, "[t]ell [Maple] all he have to do is sit still and he will walk away from this case[. He] didn't do nothing." Bushner explained that he was trying to calm Livingston and that he lied when he said that Maple was innocent. On re-direct, Bushner stated that he wrote this letter in response to one he received from Livingston.
Bushner admitted that he has a prior conviction for aggravated assault. He later explained on redirect that it was an accident.
The State called Detective Butler to the stand. He stated that he is a member of Akron's SWAT team and that on November 27, 2000 he was called to 262 Gordon Street in Norton to effectuate an arrest warrant against Maple. Detective Butler testified that upon arrival, the female occupant of the residence, later identified as Livingston, denied that Maple was inside. She later admitted that Maple was inside, and the SWAT team sent in a team to secure the premises, using gas to avoid a confrontation. When the SWAT team deployed the gas, Livingston told the officers than Maple was in a locked room on the third floor and she gave them a key to the third floor door. The SWAT team eventually found Maple and restrained him.
Detective Butler testified that he stood watch over Maple in the house for a minimum of fifteen or twenty minutes. Detective Butler further testified that during that time, Maple repeatedly asked him why he was under arrest and why the use of the SWAT team and the gas was necessary. Detective Butler testified that Lieutenant Hete appeared and informed Maple that he had a warrant for attempted aggravated murder and attempted robbery. While Hete was searching the premises, Maple turned to Detective Butler and said, "that guy said I tried to kill somebody and I broke into his house." Detective Butler testified that he felt this comment was odd because Lieutenant Hete mentioned the charge of robbery and not burglary when he spoke to Maple.
Lieutenant Hete was the final witness for the state. He testified that the investigation led to Bushner when the police obtained Brophy's phone records. Her phone records revealed numerous incoming calls from Bushner's telephone number, many in the days before and days following the shooting. The phone records also disclosed outgoing calls to Bushner's residence, in particular one made at 6:00 a.m. and one at 7:50 a.m. on the Sunday morning of the shooting. The records also revealed incoming calls from Maple's residence approximately seven days before the shooting.
Lieutenant Hete further testified that Bushner knew details such as how Maple was holding the gun on Morris and what Maple said to Morris. Hete indicated that these details were consistent with Morris' recollection and indicated a presumption that Bushner was involved. On cross-examination, Hete admitted that the police never recovered a wig or a gun used in this crime, nor did any of the prints recovered from the scene match Maple. A gun found at Bushner's home was tested for ballistic purposes and could not be excluded as the weapon used. Hete also stated that Brophy's brother, Mychael Sibley of Oakland, California, was a suspect at one point during the investigation after Morris reported missing Visa or MasterCard checks. These checks contained Sibley's fingerprints, but the police could not confirm that Sibley was in town during the month of June 2000.
Livingston, Maple's girlfriend, testified on his behalf. She stated that she lied when she told the SWAT team that Maple was not home when they came to arrest him on November 27, 2000 because a temporary protection order was in effect due to a pending domestic violence charge, barring Maple from visiting Livingston. She also stated that when she heard the SWAT team knocking at the door, she believed it to be her daughter, who does not have a key. Livingston then locked Maple in the bedroom and went to answer the front door. She first testified that she did not know why she locked the bedroom door, she "just locked it." On cross-examination the prosecution asked her again why she locked the door and she responded, "No, because I told you, because of the domestic violence and the — and I thought they had a warrant for him for that ticket when he went fishing. I thought he had a warrant, you know, an arrest for that."
Livingston testified that Maple was home with her at the time of the shooting. She stated that Maple lacerated his toes on the day before. Although she stated that at the time of the injury there was only light bleeding, she took him to the hospital two days later, where his foot was examined and he was given a walking shoe.
Although Maple presented conflicting testimony, we refuse to overturn the verdict because the jury believed Bushner, whose description of the events was consistent with statements given by the victim. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." State v. Gilliam (Aug, 12, 1998), Lorain App. No. 97CA006757, unreported, at 4. Matters of credibility are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. We find no indication that the jury lost its way and committed a manifest miscarriage of justice in convicting Maple of attempted aggravated murder, aggravated burglary, and aggravated robbery with a firearm specification; therefore, we conclude that Maple's convictions on these counts were not against the manifest weight of the evidence.
Maple's fourth assignment of error is without merit and is overruled.
Assignment of Error No. 1
 THE COURT FAILED TO DECLARE A MISTRIAL WHEN THE JURY HAD CLEARLY, BY JURY QUESTION, INDICATED THAT IT HAD CLEARLY LOST ITS WAY AND FAILED TO SATISFY THE REQUIREMENTS OF A DELIBERATING JURY.
In his first assignment of error, Maple asserts that the trial court erred when it did not declare a mistrial after the jury, during deliberations, requested a copy of court transcripts to clarify facts given during testimony. He argues that the jury had clearly lost its way and failed to meet the requirements of a deliberating jury, and, as such, the trial court should have declared a mistrial. We disagree.
We note initially that an appellate court will not consider as error any issue a party was aware of but failed to bring to the trial court's attention. Failure to object at the trial court level, when the issue is apparent at that time, constitutes a waiver of that issue, and therefore the issue need not be heard for the first time on appeal. State v. Awan
(1986), 22 Ohio St.3d 120, syllabus. An exception to this rule exists if the error amounts to plain error. See Crim. R. 52(B). However, "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. This court will apply Crim. R. 52(B) only if it appears on the face of the record that an error was committed, and the result of the trial clearly would have been different but for the alleged error. See State v. Bock (1984), 16 Ohio App.3d 146.
Maple did not request a mistrial at the trial level. Having failed to raise this issue in the trial court, Maple has waived review of all but plain error. The record and exhibits reveal that during deliberations, the jury asked the following question: "Can we please have a copy of the court transcripts for clarification of facts given during testimony?" The trial court responded, "You have to rely on your collective memory regarding all the testimony." We find no plain error in the trial court's response and no plain error in the trial court's failure to declare a mistrial.
Maple's first assignment of error is overruled.
Assignment of Error No. 2
 THE COURT IMPROPERLY ALLOWED WITNESS [BUSHNER] TO TESTIFY THAT DEFENDANT WAS DANGEROUS WITH A WEAPON IN CONTRARY TO EVID. R. 404.
In his second assignment of error, Maple argues that the trial court erred when it allowed the state, on direct examination, to present testimony over objection relating that Maple was dangerous with a weapon. Maple argues that the trial court should not have allowed Bushner to testify regarding Maple's use of weapons. He argues that he was prejudiced by such an admission. We disagree.
Evid. R. 404 prohibits the use of evidence of a person's character to prove that he acted in conformity therewith on a particular occasion. Rulings on the admissibility of evidence are within the sound discretion of the trial court. State v. Hymore (1967), 9 Ohio St.2d 122, 128. An appellate court will not disturb such rulings absent an abuse of discretion. Id. An abuse of discretion signifies more than merely an error in judgment; instead, it involves "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Id.
The record demonstrates that Maple objected to Bushner's statement and that the trial court instructed the jury to disregard the statement. Bushner's relevant testimony was as follows:
Q: Why wouldn't you chew him out with him having the gun?
 A: Maple, he — he's very dangerous with a weapon. He —
[Counsel]: Objection.
The Court: Overruled.
 A: He's — I mean, ever since I ever known him, he has been — any kind of weapon — because he has never really been a good fighter, any weapon that he could get in his hands, he's good with.
[Counsel]: Ongoing Objection, Your Honor.
 The Court: Okay, I think you've answered the question. Put another question.
 Q: So you asked him for the gun and he didn't give it to you?
 A: No. The first time, he didn't, no. I had asked him for it twice after that, and he just refused to give it to me.
 The Court: In fact, the Court is going to order the jury to disregard the answer to that question as to why Mr. Bushner was afraid of Mr. Maple. You are instructed to disregard that statement.
A jury is presumed to follow the curative instructions given by the trial court. State v. Franklin (1991), 62 Ohio St.3d 118, 127. Maple does not assert that the jury did not follow the trial court's instruction on this matter. Any error in the admission of this testimony was cured by the trial court's instruction to the jury to disregard Bushner's statements concerning Appellant's use of weapons. Accordingly, Maple's second assignment of error is overruled.
Assignment of Error No. 3
 THE PROSECUTOR'S COMMENTS IN CLOSING ARGUMENT CONSTITUTED PREJUDICIAL CONDUCT SUFFICIENT TO WARRANT REVERSAL.
In his third assignment of error, Maple asserts that he was prejudiced by the prosecutor's comments during closing argument. Maple argues that the prosecutor improperly testified regarding a meeting she had with one of the witnesses, Bushner. We disagree.
The test for prosecutorial misconduct is whether the remarks were improper and if so, whether they prejudicially affected substantial rights of the defendant. State v. Smith (1984), 14 Ohio St.3d 13, 14-15. On review, an appellate court will consider various factors such as: the nature of the prosecutor's remarks, whether defense counsel objected, whether the court gave a curative instruction, and the overall strength of the evidence against the defendant. State v. Braxton (1995),102 Ohio App.3d 28, 41.
The prosecution is entitled to wide latitude in closing arguments.State v. Treesh (2001), 90 Ohio St.3d 460, 466. However, the prosecutor's duty is to avoid going beyond the evidence that is before the jury in order to obtain a conviction. Smith, 14 Ohio St.3d at 14. An appellate court views the state's closing argument in its entirety to determine whether the defendant was prejudiced by the prosecutor's remarks.Treesh, 90 Ohio St.3d at 466. In order for an appellate court to reverse a conviction based upon prosecutorial misconduct, the alleged misconduct must rise to the level where it deprives the defendant of a fair trial.Braxton, 102 Ohio App.3d at 41.
During closing argument in this case, the prosecution stated that she was "accused of telling David Bushner what to say." The prosecution then discussed the victim's testimony. Nothing else was said concerning Bushner or the meeting between Bushner and the prosecution. Maple argues that this one statement was equivalent to the prosecution testifying. During cross-examination, Bushner was asked if the prosecutor and lieutenant reviewed prior statements with him at the jail. On re-direct, Bushner testified that neither the detective nor the prosecutor told him what to say during his testimony. Therefore, we are not faced with a situation where the prosecutor conveyed to the jury opinions or beliefs that were based on knowledge outside the evidence before the jury. To the contrary, the prosecutor's statement was based upon facts in evidence. Furthermore, we cannot conclude that such conduct deprived Maple of a fair trial.
Maple's third assignment of error is overruled.
Assignment of Error No. 5
 THE TRIAL COURT IMPROPERLY SENTENCED DEFENDANT TO CONSECUTIVE SENTENCES.
In his final assignment of error, Maple argues that the trial court erred in sentencing him to consecutive sentences without making the requisite findings on the record, in accordance with State v. Edmonson
(1999), 86 Ohio St.3d 324. We disagree.
An appellate court may remand a matter on appeal for resentencing if it finds that the trial court clearly and convincingly acted contrary to law. R.C. 2953.08(G). Clear and convincing evidence is evidence "which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." State v.Eppinger (2001), 91 Ohio St.3d 158, 164, quoting Cross v. Ledford (1954),161 Ohio St. 469, 477.
The trial court may impose consecutive sentences when the court finds consecutive sentences are necessary to protect the public or to punish the offender, provided that the sentences are not disproportionate to both the seriousness of the defendant's conduct and to the danger posed to the public. R.C. 2929.14(E)(4). The court must also find one of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
R.C. 2929.14(E)(4). Moreover, when a trial court does impose consecutive sentences, it must state on the record its reasons for doing so. R.C.2929.19(B)(2)(c); State v. Jones (2001), 93 Ohio St.3d 391, 399. This court has held that the trial court's findings need not be in the transcript of the sentencing hearing, as long as the findings are contained in the journal entry. State v. Riggs (Oct. 11, 2000), Summit App. No. 19846, unreported, at 4.
As the trial court was sentencing Maple, the court stated that in this case, "the harm caused by multiple offenses was so great or unusual that no single prison term for any of the offenses committed adequately reflects the seriousness of the conduct." The court went on to state that these offenses were the most serious forms of the offenses, and the repeated shooting of the victim was unnecessary to the accomplishment of the aggravated burglary. Furthermore, the evidence revealed that the injury to the victim was such that had one of the bullets traveled an inch in either direction, the victim would have died. Also, had the victim not received immediate medical attention, he would not have survived the bullet wounds. The court also noted Appellant's history of criminal conduct, his previous convictions for aggravated robbery and abduction, and multiple prior convictions for domestic violence.
In its journal entry, the court stated that
 consecutive sentences are necessary to protect the public from future crime by the Defendant, and the Court is of the feeling that consecutive sentences are necessary because of the seriousness of the harm and the seriousness of the offenses that were committed on the victim[.]
Thus, the court stated its reasons for imposing consecutive sentences both in journal entry and on the record during the sentencing hearing. The court satisfied the requirement, pursuant to State v. Edmonson and R.C. 2929.19(B)(2)(c), that the findings be made on the record. Appellant's fifth assignment of error is without merit and is overruled.
 III.
Having overruled Appellant's five assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
BATCHELDER, P.J., CARR, J. CONCUR.