[Cite as *State v. Pickens*, 2014-Ohio-3889.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 14AP-24 |
| v. | : | (C.P.C. No. 13CR-2835) |
| Danny A. Pickens, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on September 9, 2014

---

*Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee.

*W. Joseph Edwards*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, P.J.

{¶ 1} Defendant-appellant, Danny A. Pickens, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of aggravated burglary, violation of a protection order, and domestic violence. For the reasons that follow, the judgment of the trial court is affirmed.

I. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2} Related to acts that occurred on May 16, 2013 at the residence of Tameka Ervin, appellant was indicted on May 24, 2013 for aggravated burglary, a first-degree felony, in violation of R.C. 2911.11, violation of a protection order, a third-degree felony, in violation of R.C. 2919.27, and domestic violence, a fourth-degree felony, in violation of

R.C. 2919.25.  The matter proceeded to a jury trial where the following evidence was adduced.

{¶ 3}  Ervin testified that she has six children and appellant is the father of the three youngest.  According to Ervin, she met appellant in 2010, and the two lived together off and on until January 2012, at which time there was an incident that resulted in appellant being convicted of domestic violence against Ervin.  Also in connection with the January 2012 incident, a protection order was granted in favor of Ervin and against appellant.  The protection order was to remain in effect until January 25, 2017.  According to Ervin, since the time of the incident in January 2012, she and appellant have conversed over the phone about the children, but she has only seen appellant on two occasions, once at the hospital when their son had surgery and once at the hospital for the birth of their daughter.

{¶ 4}  Regarding the events of May 16, 2013, Ervin testified that she heard "several hard knocks" on her front door and, when she did not answer, there were "13 kicks" and then the door came down "frame and all."  (Tr. 31, 34.)  Appellant then entered the house and began chasing Ervin with a hammer while "[s]creaming, yelling, [and] cussing" at Ervin and saying things such as "[y]ou fat bitch, I told you you was going to die by my hands," and "[b]itch, I'm going to kill you."  (Tr. 41-42.)  All the while Ervin was holding the baby and calling 9-1-1.  Ervin testified that at one point appellant caught up to her and smacked her in the face with an open hand.  Appellant became unsteady, and Ervin was able to run out of the house and yell for her kids to get out of the house.  Ervin went to a neighbor's house, and appellant "proceeded to walk down the street waving the hammer in his hand, yelling and cussing and screaming."  (Tr. 51.)  When police arrived, Ervin told them she had a protection order against appellant and what had just occurred.  According to Ervin, in the days following this incident, appellant left several voicemail messages for Ervin.  In one, appellant stated "I'll be gone for about 90 days, and when I get back, you know what it is," which Ervin took as a threat.  (Tr. 53.)

{¶ 5}  Ervin's neighbor, Devonta Taylor, testified that on May 16, 2013, he saw appellant go onto Ervin's porch and knock on the door.  According to Taylor, when no one answered, appellant kicked in the door.  Taylor described that, after appellant kicked in the door, "[h]e went inside.  And then the lady came out with her baby.  He was chasing

her with a hammer. And then I told her to come next door to me. And she got—all of her kids came next door." (Tr. 66.) Taylor also testified that though he has seen appellant "hang out" on Ervin's front and back porches, he has never seen appellant go inside of the house, and he believed that, even if Ervin was home, she would not open the door for appellant. (Tr. 72.)

{¶ 6} Columbus Police Officer Samuel Streng testified that on May 16, 2013, he responded to Ervin's address on a domestic violence call. When Officer Streng arrived, Ervin was at a next-door neighbor's, and, though she had no visible injuries, Officer Streng described Ervin as "shaking, frightened, visibly scared." (Tr. 82.) Officer Streng observed that the front door of Ervin's house was "broken down" as if somebody had forced it open. Additionally, Officer Streng testified that Ervin told him that she had a protection order against appellant and that appellant had struck her in the face. According to Officer Streng, while still at Ervin's, appellant called Ervin on her cell phone.

{¶ 7} After the prosecution rested, appellant testified on his own behalf. According to appellant, on May 16, 2013, he was living with Ervin and the children at Ervin's residence and had been for approximately five months. Appellant testified that on May 16, he came home from work and changed clothes because he was going to his friend Erica's house. Appellant testified that, while he was in the kitchen eating, Erica called his cell phone. According to appellant, "[Ervin] got the phone, seeing it, started going ballistic. She knows about Erica. I'm not perfect. I do cheat on a woman. So that was the start of the argument, a pretty bad one." (Tr. 104.)

{¶ 8} Because he "got upset," appellant testified that he left the house and walked outside. As he was walking down the street, appellant decided to call Erica, but realized he had forgotten his phone in the house. Therefore, he went back to the house and knocked on the door. Appellant testified that Ervin came to the door, but refused to give appellant his phone and, instead, told him to go to Erica's to use her phone. When asked what happened next, appellant testified:

> I kicked the door. Kicked the door, flew open. By this time
> [Ervin] was standing by the—by the dining room table. I went
> into the kitchen, got my phone, got my wallet, grabbed my
> duffle bag with the dirty clothes in it so I could have Erica
> wash.

As I was coming back through out the kitchen, I could see the door, the door jamb is laying down on the floor with nails sticking out of it. I can't have that around my kids.

So as you come out the kitchen there is a closet right there where we keep our tools, the hammer and everything is right there. So I reached down to get the hammer—opened the closet, reached down to get the hammer out.

* * *

So I went to go over there and as I was going she starts screaming, she's already on the phone. I'm thinking she's joking because I don't really think she's—she is kind of dramatic. So I'm not really thinking she's really on the phone until she starts screaming, like he's going to kill me. He's going to kill me. I'm like this is—put the hammer back in the closet. And I just left. That was that.

(Tr. 105-06.)

{¶ 9} Appellant was asked if he tried calling Ervin after this incident, to which appellant testified, "Yeah, I called her and asked what was wrong with her." (Tr. 106-07.) Appellant also testified that he knew there was a protection order in place and that his presence at Ervin's was a violation of the same. When asked to explain why, appellant stated:

I have kids with this woman. She calls me up, she needs me to come over there and do something. For one, we live together, that makes everything easier. Everything—I have to provide for my kids no matter what. I have to provide for my kids. So, I mean, I understand the law and everything like that, but man, I got to * * * take care of my kids flat out so—it's cheaper for me to live in that house and put all my bills in that house and pay all the bills and make sure my kids are all right, that's what I'm going to do. So be it.

(Tr. 109-10.)

{¶ 10} After deliberations, the jury returned verdicts of guilty on all indicted charges. After the jury was discharged, a discussion occurred on the record pertaining to the scheduling of a sentencing hearing. However, appellant asked that he be sentenced

immediately. The trial court declined to do so and informed appellant that the sentencing hearing would be scheduled at a later date, at which time the following occurred:

> [APPELLANT]: I'm telling you, sentence me now. I'm telling you in front of you all right now—
>
> THE COURT: The bond is revoked.
>
> [APPELLANT]: —I am going to kill that bitch when I get the fuck out of here. That's—whether it's 15 years from now, ten years from now, I'm going to kill that bitch the day I get out of prison. Please believe that. Trust me on that.

(Tr. 247.)

{¶ 11} At the December 11, 2013 sentencing hearing, after merging the counts for domestic violence and violation of a protection order, appellant was sentenced to an aggregate ten-year term of incarceration.

## II. ASSIGNMENT OF ERROR

{¶ 12} Appellant timely appealed and brings the following assignment of error for our review:

> The trial court erred when it entered judgment against the appellant when the judgment was not supported by the manifest weight of the evidence.

## III. DISCUSSION

{¶ 13} Though his stated assignment of error challenges only the weight of the evidence presented at trial, the argument in appellant's appellate brief seemingly challenges both the weight and sufficiency of the evidence presented. Accordingly, our analysis will include a discussion of both.

{¶ 14} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio

St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 15} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed, but whether, if believed, the evidence supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime").

{¶ 16} In contrast to assessing the sufficiency of the evidence, when presented with a manifest weight challenge, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 17} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 18} Though also convicted of domestic violence, on appeal, appellant challenges only the convictions for aggravated burglary and violation of a protection order. As set forth in R.C. 2911.11(A):

> No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 19} As is relevant to this case, R.C. 2919.27(A) provides:

> No person shall recklessly violate the terms of any of the following:
>
> (1) A protection order issued or consent agreement approved pursuant to section 2919.26 or 3113.31 of the Revised Code.

{¶ 20} Appellant contends his convictions for aggravated burglary and violation of a protection order cannot stand because his testimony established that he was actually living with Ervin on May 16, 2013. Specifically, it is appellant's position that the aggravated burglary conviction fails because his testimony established that the door was kicked in "only because he had left his phone and keys inside and Ervin denied him entrance" and "[f]orcing entrance into your own home solely for the purpose of retrieving keys and a phone is not a crime in the State of Ohio." (Appellant's Brief, 7.) Similarly, appellant states the conviction for violation of a protection order must fail because Ervin acquiesced to his contact, and he believed that "Ervin voluntarily rescinded the Court[']s Order." (Appellant's Brief, 7.)

{¶ 21} The evidence presented at trial established that on January 25, 2012, Ervin and appellant signed a consent agreement and domestic violence civil protection order in accordance with R.C. 3113.31, whereby appellant was required to vacate Ervin's residence,

to refrain from initiating contact or having contact with Ervin, and to not be within 500 feet of Ervin even with Ervin's permission.  The terms of the order of protection were to remain in effect for a period of five years or until January 25, 2017.

{¶ 22} Ervin's testimony established that on May 16, 2013, appellant appeared on her porch uninvited and began knocking on the door.  When she refused to answer, appellant kicked in the door and entered the house with a hammer.  According to Ervin, appellant proceeded to chase her with the hammer while "screaming, yelling [and] cussing" and saying that he was going to kill her.  Ervin testified that, before she was able to leave the house, appellant caught up to her and smacked her in her face with an open hand.

{¶ 23} Ervin's neighbor, Taylor, testified that he witnessed appellant kick in Ervin's door, and he witnessed appellant chase Ervin with a hammer.  Additionally, Taylor testified that, although on prior occasions he had seen appellant on Ervin's porch, he had never seen appellant go inside of the house, and he did not believe that appellant lived there.

{¶ 24} When viewed in a light most favorable to the prosecution, as is required for a review of the sufficiency of the evidence supporting a criminal conviction, Ervin's testimony and the remaining evidence presented by the prosecution was sufficient to support appellant's convictions for aggravated burglary and violation of a protection order.  Consequently, we reject appellant's assertion that the record contains insufficient evidence to support his convictions.

{¶ 25} We next review appellant's argument that his convictions are against the manifest weight of the evidence.  As previously noted, in conducting a manifest weight of the evidence review, though we consider the credibility of the witnesses, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Cattledge* at ¶ 6, quoting *Seasons Coal Co.* at 80.

{¶ 26} Appellant's version of the May 16, 2013 events differed from the version about which Ervin and Taylor described.  In contrast to Ervin, appellant testified that, at the time of this incident, he and Ervin were living together and had been living together

for five months.  Appellant denied either threatening or slapping Ervin and further denied ever chasing Ervin with a hammer.  A conviction, however, is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony.  *State v. Anderson*, 10th Dist. No. 10AP-302, 2010-Ohio-5561, ¶ 19.  " '[W]here a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding either as being against the manifest weight of the evidence or contrary to law.' "  *In re L.J.*, 10th Dist. No. 11AP-495, 2012-Ohio-1414, ¶ 21, quoting *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26.  The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.  *State v. Williams*, 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58; *State v. Clarke*, 10th Dist. No. 01AP-194 (Sept. 25, 2001).

{¶ 27} Because the jury is in the best position to determine the credibility of each witness by taking into account inconsistencies, as well as witnesses' manner and demeanor, we cannot conclude this record presents a scenario where the jury clearly lost its way such that a reversal of appellant's convictions is required.  Consequently, we find appellant's convictions for aggravated burglary and violation of a protection order are not against the manifest weight of the evidence.

{¶ 28} Having concluded that appellant's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence, we overrule appellant's assignment of error.

## IV. CONCLUSION

{¶ 29} For the foregoing reasons, appellant's assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

KLATT and LUPER SCHUSTER, JJ., concur.

_____